In re Robert A. HOLSTEIN, Debtor.

**Jeffrey M. Goldberg & Associates, Ltd., Plaintiff,**

v.

**Robert A. Holstein, Defendant.**

**Bankruptcy No. 00 B 18138.
Adversary No. 00 A 00876.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 24, 2003.

Harold L. Moskowitz, Chicago, IL, for Robert A. Holstein.

Bruce C. Scalambrino, Gregg J. Simon, Scalambrino & Arnoff, Chicago, IL, for Jeffrey M. Goldberg & Associates, Ltd.

## MEMORANDUM OPINION

A. BENJAMIN GOLDGAR,
Bankruptcy Judge.

In August 1995, plaintiff Jeffrey M. Goldberg & Associates, Ltd. ("Goldberg"), a Chicago law firm, and the now-defunct Chicago law firm Holstein, Mack & Klein ("HMK") entered into an agreement to serve as co-counsel in product liability litigation concerning the "Norplant" contraceptive device. Debtor Robert A. Holstein ("Holstein") was one of HMK's equity partners.

The Norplant litigation was unsuccessful, and Goldberg lost more than $1 million because of the venture. In Holstein's bankruptcy, as well as in the bankruptcies of HMK and two other HMK equity partners, Goldberg filed proofs of claim for more than $1.28 million, a sum Goldberg claimed as damages for breach of the co-counsel agreement and for fraud. Goldberg then brought an adversary proceeding in Holstein's case seeking an order either denying Holstein a discharge under 11 U.S.C. § 727(a) or, alternatively, holding the debt to Goldberg non-dischargeable under various subsections of 11 U.S.C. § 523(a).

Now before the court is Goldberg's motion for summary judgment on the section 727(a) claims in its amended complaint. Holstein, in turn, has moved for summary judgment on all counts of the amended complaint.[1] In his motion, Holstein contends principally that Goldberg lacks standing to object to his discharge or to

---

1. Goldberg's amended complaint contains nine counts: five alleging claims section 727 claims, three alleging section 523 claims, and one labeled simply, "omitted." The original complaint contained eleven counts: six under section 727 and five under section 523. Holstein moved to dismiss all counts of the original complaint, and Judge Sonderby, to whom Holstein's case was previously assigned, dismissed the section 523 counts and one of the section 727 counts. *See Goldberg & Assoc., Ltd. v. Holstein (In re Holstein)*, 272 B.R. 463, 483 (Bankr.N.D.Ill.2001). The motion to dismiss the remaining counts was denied. *Id.* Goldberg was given leave to re-plead, *see id.*, and did so.

the debt's dischargeability in the first place.

For the reasons set forth below, the court concludes that there are no genuine issues of material fact, and that Goldberg is entitled to judgment as a matter of law. *See* Fed. R. Bankr.P. 7056(c). The court accordingly grants summary judgment to Goldberg on the section 727(a)(2)(A) claim in Count I of the amended complaint.

## I. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the district court's Internal Operating Procedure 15(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J). The court is therefore empowered to enter a final judgment. *See In re UNR Indus., Inc.*, 74 B.R. 146, 148 (N.D.Ill.1987).

## II. Facts

The parties' summary judgment materials disclose the following material facts. There is no genuine dispute about these facts.

### A. The Norplant Litigation and the Co–Counsel Agreement

In June 1995, HMK represented around 2,500 plaintiffs in product liability actions involving the Norplant device. DX 3, ¶ 10.[2] The Circuit Court of Cook County, Illinois (the "Circuit Court") had certified a class in one such action, *id.*, ¶ 7, and HMK was also representing some of the class plaintiffs in federal multi-district litigation pending elsewhere, *id.*, ¶ 8. HMK not only anticipated an award of fees in the

class litigation, it believed that many plaintiffs would opt out of the class litigation and would receive hefty damage awards in individual actions. *Id.*, ¶ 12.

By June 1995 or so, HMK had invested more than $3 million in the Norplant litigation. *Id.*, ¶ 11. The firm's partners believed the litigation had become too large for the firm to handle alone. *Id.* HMK therefore decided to recoup some of its investment by offering an interest in the litigation to another law firm or lawyer. *Id.*

Goldberg's principal, Jeffrey M. Goldberg,[3] had worked as co-counsel with Holstein in a class action several years earlier. PX 10 at 13. Around August 1995, Holstein approached Jeffrey Goldberg and proposed that Goldberg and HMK serve as co-counsel in the Norplant litigation. *Id.* Goldberg met several times with Holstein, as well as with Bruce J. Goodhart ("Goodhart") and Jewel N. Klein ("Klein"), two other HMK equity partners, to discuss the proposal. *Id.* at 14. Goldberg also reviewed pleadings from the Norplant litigation and discussed the litigation with other HMK partners. DX 33 at 14–16. Goldberg concluded that the Norplant litigation was "very good." *Id.* at 58.

Although Goldberg considered the fees it might recover, Goldberg did not ask to see HMK's financial statements or accounting records. *Id.* at 28–29. Nor was Goldberg shown a printed record of the costs that HMK had incurred to date in the Norplant litigation. *Id.* at 25. According to Goldberg, Holstein represented

---

**2.** Exhibit references are to the parties' exhibits on their cross-motions for summary judgment. Goldberg's exhibits are cited as "PX ———," and Holstein's exhibits are cited as "DX———."

**3.** The Goldberg firm is the plaintiff here, but it was Jeffrey M. Goldberg who negotiated with HMK and was active in the Norplant

litigation. The record does not always disclose when the man or the firm is the actor. Because the parties refer to Jeffrey M. Goldberg and the firm interchangeably as "Goldberg," and because it makes no difference to the outcome, this opinion will do the same.

that "the firm was doing great, that they were being very successful, they had more business than they could handle, and everything was fine." PX 10 at 30.

On August 1, 1995, HMK and Goldberg entered into an agreement to serve as co-counsel with HMK in the Norplant litigation (the "co-counsel agreement"). Under the co-counsel agreement, Goldberg would pay HMK $1 million, as well as a capped percentage of litigation costs subsequently incurred. *See* DX 1. In return, Goldberg would receive 30% of all costs and fees HMK recovered. *Id.* The agreement did not address how HMK would use the initial million dollar payment. Goldberg's Response to Holstein's Rule 402(M) Statement of Material Facts, ¶ 10.

Less than a year later, however, problems arose in the Norplant litigation. In early September 1996, the Circuit Court decertified the plaintiff class. DX 3, ¶¶ 17, 29. In the federal litigation, there were adverse rulings on substantive issues as well as verdicts of no liability. DX 3, ¶¶ 15, 18–19, 27. (In his summary judgment affidavit in this court, Holstein says he is unaware of any U.S. Norplant product liability case in which the plaintiffs prevailed on liability. DX 3, ¶ 23.)

Goldberg never recovered its investment in the Norplant litigation. Not only did Goldberg lose the money it paid HMK at the outset, Goldberg claims to have spent an additional $283,630.20 in attorney time and costs that it also lost. PX 2; DX 16–17.

Goldberg faults HMK for not doing its share of the work on the Norplant cases. Goldberg also claims HMK deceived it into entering into the co-counsel agreement.

According to Goldberg, HMK was in serious financial trouble at the time of Holstein's overtures. Among its financial woes, HMK was not current on its operating loans, and its lender, American National Bank (the "Bank"),[4] was closely monitoring HMK's finances and progress on its case files. PX 10 at 89–90. After Goldberg made the $1 million payment under the co-counsel agreement, HMK used the funds to deal with these problems, paying down obligations to the Bank and other creditors. Goldberg suggests that Holstein benefitted personally, since the payment to the Bank decreased Holstein's liability on his personal guarantee of HMK's obligations. None of this, Goldberg says, was disclosed.

Holstein admits he did not tell Goldberg about HMK's problems with the Bank. Holstein's Amended Reply to Goldberg's Rule 402(N) Statement, ¶ 9. He contends, however, that Goldberg knew the $1 million payment would be used to reimburse HMK for expenditures the firm had already made in the Norplant litigation, and that the parties understood that HMK could use the funds as it chose. DX 3, ¶ 11. Holstein says that HMK worked diligently on the Norplant litigation until the firm closed its doors.

## B. HMK's Demise and Holstein's Affiliations with RAHA and S & H

In 1996, the Bank filed an action against HMK in the Circuit Court on HMK's promissory notes. The Bank also filed a separate action against Holstein on his guarantee of the debt. *See* PX 4, PX 6.

In November of that year, HMK broke up,[5] and some of HMK's cases were trans-

---

4. American National Bank later merged with Bank One, N.A. To simplify matters, references to "the Bank" mean Bank One and its successor, American National Bank.

5. The firm "broke up" in the sense that it ceased operating as a law firm, the lawyers going their separate ways and taking clients and cases with them. The record does not

ferred to a new firm called Robert A. Holstein & Associates, P.C. ("RAHA"). DX 3, ¶ 30. At RAHA, Holstein continued to work with Goldberg on the Norplant cases. DX 3, ¶¶ 20–21, 24; PX 10 at 93–95. During the same period, Holstein and one Barbara Stackler ("Stackler"), another attorney, had an intimate personal relationship and lived together. PX 4 at 3, ¶ 15.

RAHA operated for roughly a year.[6] On December 15, 1997, Holstein transferred most of RAHA's assets to Stackler. See PX 3, Ex. F; PX 4 at 4, ¶ 19.[7] Holstein subsequently worked for a law firm dubbed Stackler & Holstein ("S & H"), though only (he asserts) as an "employee." DX 3, ¶ 26.

### C. Transfers of Holstein's Personal Assets to Stackler

Holstein maintains that in the course of their relationship, Stackler lent more than $300,000 to him and to RAHA. In return, Holstein claims he transferred his personal and business assets to Stackler. Although no documents evidence the alleged loans, several documents memorialize the transfers of assets. PX 4 at 4, ¶ 20.

Holstein claims that Stackler first lent $100,000 to him and RAHA on March 15, 1997. Holstein and Stackler executed a "Collateral Assignment Agreement" pro-

viding for a transfer of "all of [Holstein's] individual assets not otherwise encumbered." See PX 3, Ex. C, ¶ 2. The agreement recited that Holstein owned interests in two limited partnerships: the "Bloomfield Hills, Vic Tanney Limited Partnership" and the "Wilmette Office Court Limited Partnership." Id. The agreement also mentioned Holstein's 40 percent ownership interest in the stock of Cemetery Enterprises, Inc.[8] Id.

During a 1997 merger involving Cemetery Enterprises, Holstein also acquired stock in Carriage Services, Inc., a publicly traded company. See PX 3, Ex. D. Around May 1, 1997, in contemplation of that transaction, Holstein and Stackler executed an "Amendment to Collateral Assignment Agreement" assigning to Stackler all contract rights that Holstein would acquire in the Carriage Services merger. See id.

Holstein says he transferred the Carriage Services stock and two partnership interests to Stackler on July 15, 1997, after RAHA defaulted on loans from Stackler totaling "well beyond $100,000.00." See PX 3, Ex. E. To accomplish the transfer, Holstein and Stackler executed an "Assignment in Lieu of Foreclosure," reciting that Holstein was assigning to Stackler "all of his individual assets" to keep Stackler

reveal whether there was any formal dissolution of the partnership or organized effort to wind up its affairs. The subsequent bankruptcy filing suggests there was not.

6. When exactly RAHA ceased business is unclear. As late as May 1999, RAHA may still have been working on the Norplant case. See DX 22 at 2 n.1; PX 9 at 3.

7. PX 4 is the October 19, 2000 order of the Circuit Court in *American Nat'l Bank & Trust Co. of Chicago v. Robert A. Holstein et al.*, Nos. 96 L 4043, 96 L 4927 (Cir. Ct. Cook Cty.). As discussed below, this court concludes that the Circuit Court's factual findings

have preclusive effect in this proceeding. To the extent they are material, then, those facts are considered undisputed for purposes of the current motions.

8. Holstein's interests in the Bloomfield Hills and the Wilmette Office Court partnerships, as well as his stock ownership interest in Cemetery Enterprises, appeared on a list of personal assets in the Collateral Assignment Agreement. See, PX 3, Ex. C, ¶ 2. The list also included other business interests: (1) Metro Golf (warrants, 5,000 shares at $6.00 per share); (2) CMA Holdings, Inc. (3–1/2% stock ownership); and (3) Color Me Coffee (17% stock ownership). Id.

from foreclosing on Holstein's collateral. *Id.*

Holstein did not notify either the Bloomfield Hills Partnership or the Wilmette Office Court Partnership of the assignment to Stackler. PX 4 at 3, ¶ 16. Between July 1997 and October 2000, he received distributions from both partnerships and then transferred the money to Stackler. *Id.,* ¶¶ 12 and 14.

Although Holstein continued to own 973 shares of Carriage Services stock, in September 1997 and January 1998 he transferred most of his Carriage Services stock to Stackler. *Id.,* ¶¶ 7–9. Stackler sold the Carriage Services stock for more than $370,000. *Id.,* ¶¶ 8–9. In September 1997, Holstein also transferred $65,653.31 in cash from the Carriage Services merger to Stackler. *Id.,* ¶ 10.

After the alleged transfers of Holstein's and RAHA's assets, Stackler supported Holstein. PX 4 at 3, ¶ 15; *see also* PX 30.

### D. The HMK, Klein and Goodhart Bankruptcies

On September 30, 1997, Goodhart filed an involuntary Chapter 7 petition against HMK. The bankruptcy court entered an order for relief on November 3, 1997. Less than two weeks later, both Klein and Goodhart filed their own petitions for relief under Chapter 7. *See* DX 15. Goodhart's case would later be converted to a reorganization under chapter 11.

On November 22, 1999, the court in the HMK case ordered HMK's partners to file verified statements of personal assets and liabilities pursuant to Fed. R. Bankr.P. 1007(g). PX 3, Ex. P. When Holstein filed his statement on January 9, 2000, he de-

clared that he owned no real estate investments or partnership interests. *See* PX 3, Ex. Q at 3. He also declared that he received no annual income from partnership interests. *Id.* at 4. Holstein's financial statement made no mention of the Carriage Services stock.

In May 1998, Goldberg filed proofs of claim for $1,283,630.20 in the Klein and Goodhart bankruptcies cases. *See* DX 16–17. In the space on the form calling for a description of the basis for the claim, Goldberg stated "see attached agreement," *id.,* meaning the co-counsel agreement.

A week later, Goldberg commenced an adversary proceeding in the Goodhart bankruptcy case objecting to the dischargeability of the debt. DX 18.[9] In its complaint, Goldberg alleged that "[i]n 1995, Goodhart and his partners approached Goldberg's principal," *id.,* ¶ 11, and that "Goodhart's proposal was that Goldberg would act as co-counsel in the Norplant litigation," *id.,* ¶ 12. According to the complaint, "[i]n negotiations concerning this arrangement, Goodhart, as well as the other HMK equity partners" made material misrepresentations and omissions concerning HMK's financial condition, *id.,* ¶ 14, and "intended to deceive Goldberg," *id.,* ¶ 17. In Counts I through III, Goldberg sought a determination of non-dischargeability under 11 U.S.C. § 523(a)(2).

Goldberg's adversary proceeding never went to trial. The case settled, with Goodhart consenting to entry of a judgment against him in the amount of $250,000. *See* DX 19.[10] The settlement agreement

---

**9.** Goldberg apparently did not object to the dischargeability of the debt in Klein's bankruptcy case. Klein's case remained a proceeding under chapter 7. A no-asset report was entered in the case, and Klein was discharged on October 23, 1998.

**10.** The "Agreed Order of Judgment of Non-dischargeability of Debt" recited that the debt was "nondischargeable pursuant to 11 U.S.C. § 523(a)" and that the claim of $250,000 would be paid in full in any plan of reorganization that Goodhart submitted. DX 19 at 2.

contained a mutual release of Goodhart's and Goldberg's claims against one another. DX 35 at 5–6.

### E. Citation Proceedings in the Bank's Circuit Court Action

Although HMK had folded some two years earlier, as of late 1998 Holstein (unlike his partners) still had not sought bankruptcy protection. In the Circuit Court, the Bank's actions against Holstein and against HMK had been consolidated. *See* PX 4 at 1. On October 1, 1998, the Bank prevailed in the consolidated action, and the Circuit Court entered a judgment for $748,006.39 in favor of the Bank and against Holstein. *Id.*, ¶ 1.

Two months later, the Bank served Holstein with a citation to discover assets, *see* DX 20 at 1, ¶ 4, examining Holstein on two dates around the beginning of May 1999. *See* PX 8 at 90. In the course of his testimony, Holstein disclosed that in July 1997 he had transferred his interests in the Bloomfield Hills and Wilmette Office Court partnerships to Stackler. *See* DX 22 at 3–4.

Despite the disclosure, the Bank remained skeptical. On July 22, 1999, it filed a motion for turnover in the Circuit Court, naming Stackler, Holstein and RAHA as "third-party respondents." *See* DX 22 at 1. In the motion, the Bank claimed that Stackler and Holstein had not in fact entered into any loan agreements, and that Holstein had not in fact transferred the partnership interests to Stackler. *Id.* at 5–7, 11–12. The Bank asserted that Holstein still owned the partnership interests and sought their turnover. *Id.* at 13.

Besides seeking turnover of the partnership interests, in the same motion the

Bank sought as an alternative to avoid Holstein's earlier transfers of partnership income and the Carriage Services stock. *Id.* at 9–10. The Bank also requested a judgment against Stackler equal to the partnership income she had received and the proceeds from any sale of the Carriage Services stock. *Id.* at 13–14.

On September 13, 1999, the Bank filed a complaint in the Circuit Court action incorporating the allegations of its motion for turnover. PX 9. The Circuit Court set the matter for trial on June 21, 2000. *See* DX 20 at 3.

### F. Holstein's Bankruptcy Filing and Creditors' Meeting

On June 19, 2000, two days before the scheduled trial, Holstein filed a petition for relief under Chapter 7. With his petition, Holstein submitted a schedule of unsecured creditors that listed Goldberg as a creditor, characterizing Goldberg's claim as "disputed." Holstein described the claim as arising out of a "trade contract dispute."

Holstein did not include the Bloomfield Hills and Wilmette Office Court partnership interests in his schedule of personal property. PX 3, Ex. A; PX 11 at 42–43. And although Holstein disclosed in his statement of financial affairs that he was a party to the Bank's Circuit Court action, he did not bother to describe either the allegations or the relief sought in the action. PX 3, Ex. A.

At the July 25, 2000 meeting of creditors in his bankruptcy case, Holstein testified that he had included all his assets and liabilities in his bankruptcy schedules. PX 5 at 2. From the schedules, it appeared to the trustee that Holstein's debts exceeded his assets. *Id.* at 16–17. After the credi-

---

The "remainder of Goldberg's claim in the sum of $750,000.00 ... [would be] allowed as a dischargeable general unsecured claim, and [would] be treated as such in any plan of reorganization." *Id.*

tors' meeting, the trustee filed a no-asset report. *Id.* at 18.

### G. Trial and Decision in the Circuit Court

To pursue its action in the Circuit Court, the Bank filed a motion in Holstein's bankruptcy seeking retroactive relief from the automatic stay. *See* DX 20. The Bank's motion was granted on July 17, 2000, and the case went to trial, the Circuit Court hearing five days of testimony in August and September 2000. *See* PX 4 at 1.

Holstein appeared in the Circuit Court and testified on at least three different days. *See* DX 24–25. Holstein was not represented by counsel. As far as the record shows, Holstein's bankruptcy counsel was not present at trial. DX 24 (8/22/00 Tr. at 3–4, 13). The attorney who had filed an answer on behalf of Holstein and Stackler withdrew on the first day of trial, commenting that Holstein and Stackler were no longer an item, and that he now had a conflict of interest. *See* DX 24 (8/22/00 Tr. at 4–6). Thereafter, Holstein appears to have represented himself.

Before withdrawing, the attorney for Stackler and Holstein expressed his belief that the property interests at issue in the action had become property of Holstein's bankruptcy estate. DX 24 (8/22/00 Tr. at 3, 13). Counsel for the Bank also represented to the Circuit Court that he had spoken with Holstein's trustee and had told the trustee that the Bank held a perfected security interest in the property it sought to recover. DX 24 (8/22/00 Tr. at 14). Since the Bank had perfected its lien more than 90 days before Holstein's bankruptcy filing, the Bank believed its lien could not be avoided and that any of Holstein's assets recovered would go to the Bank. DX 24 (8/22/00 Tr. at 14); DX 25 (9/13/00 Tr. at 26–27).

On October 19, 2000, the Circuit Court entered an extensive Order making findings and entering judgment.

The Circuit Court found that Holstein had transferred (or purported to transfer) virtually all his personal assets to Stackler on July 15, 1997, and that he had transferred all the business assets of his law firm to Stackler on December 15, 1997. PX 4 at 4, ¶¶ 7–10, 19. Despite the apparent transfers, however, Holstein in fact continued to control the assets. *Id.* at 3, ¶ 16. The Circuit Court concluded that Holstein was "currently" the owner of an interest in the Bloomfield Hills Partnership, an interest in the Wilmette Office Court Partnership, and 973 shares of Carriage Services stock. *Id.* at 2–3, ¶¶ 7, 11, 13.

The Circuit Court rejected Holstein's assertion that he had received reasonably equivalent value because the transfers were consideration for loans Stackler made to him. *Id.* at 4, ¶ 20. The evidence for this assertion, the Circuit Court said, was neither sufficiently detailed nor supported with any sort of documentation: "[n]o promissory notes, books of account, or the like were offered." *Id.* Moreover, bank records of Holstein and HMK suggested that at most Stackler had " 'loaned' " Holstein $31,500 as of July 2000. The Circuit Court deemed Holstein's and Stackler's explanation for the transfers "inherently unbelievable." *Id.*

The Circuit Court accordingly ruled that the transfers were fraudulent, made with the "actual intention of hindering, delaying or defrauding Holstein's creditors." *Id.* at 4, ¶ 21. The various agreements executed in connection with the alleged assignment and transfer of Holstein's assets "were all executed between Holstein and Stackler as an elaborate hoax to put his assets into her hands and shield them from his creditors." *Id.* at 4, ¶ 20.

As relief, the Circuit Court entered a "charging order" against Holstein's interests in the Bloomfield Hills and Wilmette Office Court partnerships. *Id.* at 5, ¶ 1. Under the order, the Bank was entitled to receive any partnership income payable to Holstein until the Bank's judgment was paid in full, or until the partnership interests were sold. *Id.* at 5, ¶ 2. Bank was authorized to sell the partnership interests to the other partners. *Id.* at 5, ¶ 3. With respect to the stock, Carriage Services was ordered to transfer Holstein's 973 shares to the Bank whenever those shares were released from escrow. *Id.* at 6, ¶ 4. Upon transfer, the Bank was to liquidate the shares and apply the proceeds to the reduction of its judgment. *Id.*

The Circuit Court next found that between 1997 and the present, Holstein had transferred to Stackler $32,598.90 in income from the Bloomfield Hills Partnership and $14,700 in income from the Wilmette Office Court Partnership. *Id.* at 3, ¶¶ 12 and 14. In addition to the partnership income, Holstein had transferred 14,966 shares of Carriage Services stock to Stackler, as well $65,543.31 in cash received in the September 1997 Carriage Services merger. *Id.* at 2, ¶¶ 8–10. The Circuit Court found that Stackler had sold the Carriage Services stock, receiving $372,259.12. *Id.* Based on these determinations, the Circuit Court entered judgment against Stackler for $485,101.33. *Id.* at 6, ¶ 5.

The Circuit Court declared its Order final and appealable under Illinois Supreme Court Rule 304(b)(4), *see id.* at 6, ¶ 6. The record before this court does not show that the Order was appealed.

In January 2001, the trustee in Holstein's bankruptcy moved to vacate the no-asset report, attaching a copy of the Circuit Court's Order. *See* PX. 7, Ex. B.

### H. Holstein's "Newly Discovered Evidence"

Holstein maintains that in January 2002, long after the time to appeal the Circuit Court's Order had come and gone, he found evidence supporting his contention that Stackler lent money to him and RAHA. DX 3, ¶ 32; DX 29–30. The evidence consisted of "various documents including a promissory note to Private Bank in affiant's name wherein his signatures are obviously forged by Barbara Stackler." [11] DX 3, ¶ 32. The record does not show that Holstein ever moved to set aside the Circuit Court's judgment on the basis of this "newly-discovered evidence."

### III. Analysis

As discussed at the outset, Goldberg has moved for summary judgment on its objections to Holstein's discharge under section 727(a), 11 U.S.C. § 727(a), not its claims under section 523(a), 11 U.S.C. § 523(a). Holstein, meanwhile, has sought summary judgment on all counts of Goldberg's amended complaint. Holstein's principal contention is that Goldberg is not his "creditor" and so lacks standing to object to his discharge. He makes only a token effort to contest Goldberg's section 523(a) and 727(a) claims as such.

On a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) (internal quotation omitted). If there is no genuine issue of material fact for trial, the sole question is whether the movant is entitled to summary judgment as a matter of law.

---

11. Holstein's theory seems to rest on the unsupported premise that to make loans to Holstein and RAHA, Stackler's finances would have required her to borrow funds from a bank, and so she could have been expected to execute promissory notes.

*Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996).

Based on the undisputed material facts, the court concludes that Goldberg is entitled to summary judgment on Count I of its amended complaint. Goldberg is a "creditor" and has standing under section 727(c) to object to Holstein's discharge. Goldstein, moreover, has demonstrated that Holstein "concealed property of the debtor" within one year of filing bankruptcy and did so "with intent to hinder, delay or defraud" Goldberg. 11 U.S.C. § 727(a)(2)(A). Holstein will therefore be denied a discharge.

### A. Standing

■ The first question, and the only one Holstein hotly contests, is standing. It is important, first of all, to explain what Holstein means by "standing." Generally, standing concerns whether a litigant "is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In federal court, however, standing has two aspects, one constitutional, the other "prudential." *Id.*

■ The constitutional aspect comes from the "case or controversy" requirement in Article III. To meet that requirement, a plaintiff seeking relief must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Considerable judicial effort has gone into defining the kind of "injury in fact" that satisfies Article III: an injury that is concrete and particularized, that is actual or imminent and not merely hypothetical, that is fairly traceable to the defendant's conduct, and that is likely to be redressed by a favorable decision. *See id.* at 560–61, 112 S.Ct. 2130 (internal quotations omitted); *Payton v. County of Kane*, 308 F.3d 673, 677 (7th Cir.2002). No "injury in fact," so defined, means no standing and thus no "case or controversy" invoking federal jurisdiction.

■ The "prudential" aspect, on the other hand, involves standing limits that are "essentially matters of judicial self-governance" meant to ensure that the courts only resolve disputes suitable for judicial resolution. *Warth*, 422 U.S. at 499–500, 95 S.Ct. 2197; *see also Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. One such limit requires that a plaintiff suing under a statute or the Constitution "fall within the zone of interests protected or regulated by the statute or constitutional guarantee in question." *FMC Corp. v. Boesky*, 852 F.2d 981, 988 (7th Cir.1988) (internal quotation omitted). This is sometimes called "statutory standing," meaning that "the particular federal statute the plaintiff seeks to invoke must afford the plaintiff a right to relief." *Id.; see also Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see, e.g., Alto Dairy v. Veneman*, 336 F.3d 560, 562 (7th Cir.2003).

In this case, only the second, prudential aspect of standing is at issue. Holstein does not dispute Goldberg's standing in the Article III sense, and there is no "injury in fact" problem evident here. Holstein instead contests Goldberg's "statutory standing." The statute in question, section 727(c), limits who can raise objections to discharge: "[t]he trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section." 11 U.S.C. § 727(c). According to Holstein, Goldberg lacks standing to seek denial of Holstein's discharge under section 727(a) because Goldberg is not a "creditor" under section 727(c).

■ Holstein is mistaken. The Code defines the term "creditor" as an "entity

that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). To be a creditor with standing under section 727, then, Goldberg only has to have a "claim" against Holstein that arose before Holstein filed his bankruptcy petition.

■ The Code's definition of claim is "expansive." *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). Indeed, it could hardly be more so. *See In re Okura & Co. (America), Inc.*, 249 B.R. 596, 602 (Bankr.S.D.N.Y.2000). "Claim" encompasses any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). In section 101(5), Congress contemplated that "all legal obligations of the debtor" would "be dealt with in the bankruptcy case," *Davenport*, 495 U.S. at 558, 110 S.Ct. 2126 (internal quotation omitted), and so adopted "the broadest available definition of 'claim,'" *Johnson v. Home St. Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

■ Goldberg is rather obviously a creditor under this definition. Goldberg asserts a right to damages from Holstein based (1) on HMK's alleged breach of the co-counsel agreement and (2) on the allegedly fraudulent actions of Holstein and other HMK partners in inducing Goldberg to sign the co-counsel agreement. A person's assertion that he deserves damages from the debtor for breach of contract and fraud is the assertion of a "right to payment" and therefore is a "claim." 11 U.S.C. § 101(5)(A). Because such a person has a "claim," he is a "creditor," 11 U.S.C. § 101(10)(A), and has standing under section 727(a).

Holstein, however, contends that Goldberg is not a "creditor" because Goldberg's claim is meritless, and Holstein discusses the reasons why at length. The fraud claim, he asserts, is insufficient, either because it is based on promises of future performance or because Goldberg released his claims against Holstein's "joint tortfeasor" Goodhart. The contract claim is no good because HMK did not breach the co-counsel agreement. Goldberg's claim is barred under the doctrine of election of remedies. And in any event, Holstein argues, Goldberg has been paid in full.

These arguments are beside the point. That Holstein disputes Goldberg's claim— that Goldberg might conceivably not prevail on its claim—does not make Goldberg any less a creditor in Holstein's bankruptcy. A claim includes any "right to payment, whether ... disputed [or] undisputed." 11 U.S.C. § 101(5)(A). "[T]he Code expressly recognizes that a disputed claim is nevertheless a claim." *In re Knight*, 55 F.3d 231, 234 (7th Cir.1995); *McGrath v. Moreau (In re Moreau)*, 161 B.R. 742, 745 (Bankr.D.Conn.1993); *see also Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp)*, 209 F.3d 125, 128 (2nd Cir.2000) (" 'claim' " includes "all legal obligations of the debtor, no matter how remote or contingent") (internal quotation omitted).

Nor is it necessary to decide the merits of Goldberg's claim before reaching Goldberg's objections to Holstein's discharge. Nearly all courts faced with objections to standing on this basis decline to adjudicate the merits of the creditor's disputed claim.[12] *See, e.g., Korte v. United*

---

12. There have been rare exceptions. *See Ho-* *rizon Financial, F.A. v. Gresham (In re Gres-*

*States (In re Korte)*, 262 B.R. 464, 470–71 (8th Cir. BAP 2001); *First Commercial Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr.N.D.Ill. 2002); *Solomon v. Barman (In re Barman)*, 244 B.R. 896, 899 (Bankr.E.D.Mich. 2000); *Moreau*, 161 B.R. at 745. Since the holder of a disputed claim is a "creditor," these courts reason, the creditor has standing to seek denial of the debtor's discharge notwithstanding the dispute.[13] *See Hermanson*, 273 B.R. at 545; *Korte*, 262 B.R. at 470–71; *Barman*, 244 B.R. at 899; *Moreau*, 161 B.R. at 744–45.

This is a fair result. In a bankruptcy case, the debtor can have disputed claims discharged without any adjudication of those claims and so regardless of whether the claims are meritorious. *Stanley v. Vahlsing (In re Vahlsing)*, 829 F.2d 565, 567 (5th Cir.1987) (noting that a discharge affects "the interests of creditors with disputed claims since they have a chance of prevailing on their claims"); *Hermanson*, 273 B.R. at 545. Since the debtor can achieve this result by invoking bankruptcy jurisdiction, holders of disputed claims should be able to raise objections under section 727(a) to the debtor's discharge in bankruptcy without establishing the merit of their claims. *See Korte*, 262 B.R. at 471; *Moreau*, 161 B.R. at 745 (citing *Stone v. Stone (In re Stone)*, 90 B.R. 71, 73 (Bankr.S.D.N.Y.1988)).

Nor does this result deprive Holstein of an opportunity to contest Goldberg's claim. This court's refusal to address the merits of Goldberg's claim means only that the merits will not be decided in bankruptcy court. If a creditor holding a disputed claim prevails on its section 727 objection to discharge, the automatic stay will lift, *see* 1 R. Ginsberg, *et al.*, *Ginsberg & Martin on Bankruptcy* ¶ 11.01[B] at 11–12 (4th ed.2003), and the creditor can pursue his claims elsewhere. Here, this court's summary judgment decision in Goldberg's favor will lift the stay, and Goldberg will be able to bring its claims (which are, after all, state law claims) in Illinois state court. Holstein can raise his arguments there.

Any other result, finally, would threaten judicial economy. Under Holstein's view, a debtor in bankruptcy can always assert as a defense to a creditor's discharge objection that the creditor's claim was legally or factually unsupportable. If that were true, every decision on an objection to discharge would inevitably entail a decision on the merits of the objecting creditor's claim. Bankruptcy courts would end up deciding multitudes of substantive claims ordinarily the province of state courts and federal district courts. In defining a "creditor" to include those holding "disputed" as well as "undisputed" claims, Congress evidently had something else in mind.

---

*ham)*, 95 B.R. 836 (Bankr.S.D.Fla.1988) (reaching merits of debtor's objection to creditor's claim and finding creditor lacked standing); *Putnam County Sav. Bank v. Bagen (In re Bagen)*, 185 B.R. 691, 701 (Bankr.S.D.N.Y. 1995) (postponing decision on discharge and dischargeability until creditor first pursued its claim in the state court).

13. There appear to be only two circumstances where unsecured creditors are found to lack standing under section 727(c). Some courts have denied a creditor standing when the automatic stay had been modified to permit

the creditor to pursue his claim in another court, and the creditor did so and lost. *See, e.g., Vahlsing*, 829 F.2d at 567; *Geisler v. Pansegrau (In re Pansegrau)*, 180 B.R. 468, 476 (Bankr.N.D.Tex.1995). At least one court has deemed a creditor to lack standing when the creditor purchased claims against the debtor and then objected to discharge purely as harassment. *See, e.g., Young v. Beugen (In re Beugen)*, 99 B.R. 961, 965 (9th Cir. BAP 1989), *aff'd without op.*, 930 F.2d 26 (9th Cir.1991). Neither of these circumstances is present here.

Because Goldberg holds a "claim" under 11 U.S.C. § 101(5)(A) and hence is a "creditor" under 11 U.S.C. § 101(10)(A), the court concludes that Goldberg has standing to seek the denial of Holstein's discharge regardless of the merits of Goldberg's claim.

## B. Denial of Discharge

Having placed most of his eggs in the standing basket, Holstein offers no more than a perfunctory defense to Goldberg's five section 727(a) claims. Since the relief is the same for each such claim—a denial of discharge—the court need only address one of them: the claim in Count I.[14] *See In re Krehl,* 86 F.3d 737, 744 (7th Cir.1996) (noting that proof of conduct satisfying any subsection of section 727 is sufficient to deny discharge). Goldberg alleges in Count I that Holstein should be denied a discharge under section 727(a)(2)(A) because Holstein concealed his interests in certain assets, including the Wilmette Office Court partnership, in the year before he filed bankruptcy.[15]

### 1. Section 727(a)(2)

■ Section 727(a)(2)(A) is one of several Code provisions denying a discharge to unscrupulous debtors. The bankruptcy system is intended to grant a discharge to the "honest but unfortunate debtor," *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (internal quo-

tation omitted), and depends on debtors being "fully forthcoming about their financial affairs." *Swartz v. Spears (In re Spears),* 291 B.R. 825, 829 (Bankr.C.D.Ill. 2003) (internal quotation omitted). A discharge will be denied to "a debtor who was less than honest." *Village of San Jose v. McWilliams,* 284 F.3d 785, 790 (7th Cir. 2002); *see also Peterson v. Scott (In re Scott),* 172 F.3d 959, 968 (7th Cir.1999) (noting that "complete financial disclosure is a condition precedent to the privilege of discharge") (internal quotations omitted).

■ Section 727(a)(2)(A) of the Bankruptcy Code accordingly denies a discharge to a debtor who,

> with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). This exception to discharge has two elements: "an act (*i.e.,* a transfer or a concealment of property) and an improper intent (*i.e.,* a subjective intent to hinder, delay or defraud a creditor)."[16] *In re Kontrick,* 295 F.3d 724,

---

**14.** Nor is there any reason to address the section 523(a) claims. The section 727(a) and 523(a) claims were sought as alternatives. Success under section 523(a) results only in the denial of discharge for a particular debt. "A denial of discharge under section 727(a)," on the other hand, "is total, causing all creditors to continue to have a post-petition claim against the debtor and his present and future assets." *Coggin v. Coggin (In re Coggin),* 30 F.3d 1443, 1452 (11th Cir.1994).

**15.** The remaining section 727(a) counts invoke other parts of the statute. In Counts III and VI, Goldberg alleges that Holstein should be denied a discharge under sections

727(a)(4)(A) and (6)(A) for having omitted these interests in property from his bankruptcy schedules and from the financial statement that he filed in the HMK bankruptcy case. In Counts II and V, Goldberg alleges that Holstein should be denied a discharge under sections 727(a)(3) and (5) because he did not maintain and preserve records of his transactions with Stackler and cannot satisfactorily explain those transactions.

**16.** The cases sometimes break section 727(a)(2)(A) down into four elements. *See, e.g., McWilliams,* 284 F.3d at 791; *Lee Supply Corp. v. Agnew (In re Agnew),* 818 F.2d 1284, 1287 (7th Cir.1987). There is no substantive

736 (7th Cir.2002), *cert. granted,* —— U.S. ——, 123 S.Ct. 1899, 155 L.Ed.2d 824 (2003); *Keeney v. Smith (In re Keeney),* 227 F.3d 679, 683 (6th Cir.2000). Both elements must have been present during the year before bankruptcy; anything occurring earlier is "forgiven." *Kontrick,* 295 F.3d at 726. The party objecting to discharge has the burden of proving these elements by a preponderance of the evidence. *Scott,* 172 F.3d at 966–67.

### 2. Collateral Estoppel

In this case, Goldstein proposes to meet his burden of proof largely, though not entirely, through matters decided in the Bank's Circuit Court action, matters he says Holstein is no longer entitled to contest. Goldstein, in other words, relies on the doctrine of collateral estoppel (or issue preclusion, as it is currently known), which "prevents a party from relitigating an issue that it has previously litigated and lost." *Jensen v. Foley,* 295 F.3d 745, 748 (7th Cir.2002).

 Collateral estoppel unquestionably applies to discharge proceedings in bankruptcy. *See Grogan,* 498 U.S. at 284 n. 11, 111 S.Ct. 654 (suggesting that "principles of collateral estoppel apply in bankruptcy proceedings" and holding that those principles apply to objections to dischargeability under section 523). Those proceedings include objections to the debtor's discharge under section 727(a). *See Cohen v. Bucci,* 905 F.2d 1111, 1112 (7th Cir.1990); *Giant Eagle, Inc. v. Monus (In re Monus),* 294 B.R. 707, 716–18 (Bankr.N.D.Ohio 2003); *United States v. Towe (In re Towe),* 147 B.R. 545, 547 (Bankr.D.Mont.1992), *aff'd,* 74 A.F.T.R.2d (RIA) 94–7423 (D.Mont.), *aff'd without op.,* 97 F.3d 1461 (9th Cir. 1996). Facts found and issues decided in

an earlier case may dictate the denial of discharge, *see, e.g., Towe,* 147 B.R. at 548–51, or may, with other evidence, support that result.

 Whether the relevant collateral estoppel principles are state or federal, however, depends on whether the judgment claimed as preclusive is state or federal. Federal courts are obligated to give state "judicial proceedings" the "same full faith and credit" those proceedings would have in the courts of that state. 28 U.S.C. § 1738; *see American Nat'l Bank & Trust Co. v. Regional Transp. Auth.,* 125 F.3d 420, 430 (7th Cir.1997). Hence, " 'the preclusive effect of a state court judgment in a federal case is a matter of state rather than of federal law.' " *A.D. Brokaw v. Weaver,* 305 F.3d 660, 669 (7th Cir.2002) (quoting *CIGNA HealthCare of St. Louis, Inc. v. Kaiser,* 294 F.3d 849, 856 (7th Cir.2002)). Because Goldberg relies on the findings of an Illinois state court, Illinois law on collateral estoppel governs.

 Under Illinois law, collateral estoppel applies "when a party, or someone in privity with a party, participates in two separate and consecutive cases arising on different causes of action and some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." *Nowak v. St. Rita High School,* 197 Ill.2d 381, 389, 258 Ill.Dec. 782, 757 N.E.2d 471, 477 (2001). Reduced to its essence, the doctrine has three requirements: (1) that a prior case presented an identical issue; (2) that the case ended in a final judgment; and (3) that the party against whom estoppel is asserted was a party to the case. *Du Page Forklift Serv., Inc. v. Material*

difference between the two formulations. *See Rhode Island Depositors Economic Prot. Corp. v. Hayes (In re Hayes),* 229 B.R. 253, 259 n. 8

(1st Cir. BAP 1999) (employing the four-element version but noting that the "two-point articulation" is "substantively identical").

*Handling Servs., Inc.*, 195 Ill.2d 71, 77, 253 Ill.Dec. 112, 744 N.E.2d 845, 849 (2001).

The question here is whether Goldberg has met these requirements. The answer is yes.

### a. Identity of Parties and Final Judgment

The last two are easily satisfied. To begin with, Holstein was plainly a party to the Circuit Court action. He was a named defendant, *see* PX 4, he had a judgment entered against him in 1998, *id.*, ¶ 1, he was named in the Bank's subsequent complaint for turnover, *see* PX 4, he represented himself and testified at the trial on that complaint, DX 24–25, and following trial, he had yet another order entered against him, *see* PX 4.

That order, the October 19, 2000 Order, was a final judgment on the merits of the turnover complaint. The order adjudicated all issues with respect to all parties in the supplementary proceeding, *see id.*, and it does not appear the order was ever appealed—certainly Holstein does not claim that he or anyone else appealed it. Under Illinois law, an order that disposes of the rights of the parties and leaves nothing else for the trial court to do is a final order. *Dubina v. Mesirow Realty Dev., Inc.*, 178 Ill.2d 496, 502, 227 Ill.Dec. 389, 687 N.E.2d 871, 874 (1997); *In re Estate of French*, 166 Ill.2d 95, 101, 209 Ill.Dec. 677, 651 N.E.2d 1125, 1128 (1995). There was nothing else for the Circuit Court to do on the Bank's complaint.[17]

Holstein does not deny that the Circuit Court's decision was a final judgment on the merits. He argues, however, that he was not a party to the action. In Holstein's view, the litigation was "only between ANB [the Bank] and Stackler."

Hardly. Holstein was expressly named a defendant in the Bank's action and again in the Bank's supplementary proceeding. How Holstein can contend otherwise is a mystery. Although, as Holstein notes, the Circuit Court's October 19, 2000 Order entered a money judgment only against Stackler, the relief awarded is a red herring.[18] What matters is that Holstein was a party to the action, that the 1997 transactions between Stackler and Holstein were fully litigated with Holstein's participation, and that a final judgment resulted. *Du Page Forklift*, 195 Ill.2d at 77, 253 Ill.Dec. 112, 744 N.E.2d at 849.

### b. Identity of Issues

The remaining element—identity of issues—is also satisfied. The issues decided in the Circuit Court's Order get Goldberg most of the way, though not all the way, to satisfying section 727(a)(2)(A).

First, the Order, coupled with other evidence, establishes that Holstein "concealed ... property of the debtor." 11 U.S.C. § 727(a)(2)(A). For purposes of section 727(a)(2), a concealment consists of

---

**17.** Although an Illinois trial court's characterization of its order as final is not conclusive, *Board of Trustees v. Rosewell*, 262 Ill.App.3d 938, 948, 200 Ill.Dec. 74, 635 N.E.2d 413, 423 (1st Dist.1992), it is worth noting that the Circuit Court declared the October 19, 2000 Order "a final order pursuant to Illinois Supreme Court Rule 304(b)(4)," PX 4, ¶ 6, which renders final and appealable an order granting or denying relief in a supplementary proceeding. *See* Ill. Sup.Ct. R. 304(b)(1). The Circuit Court thought the case was over.

**18.** Holstein is wrong, however, to claim no relief at all was awarded against him. The Circuit Court ordered payment to the Bank of Holstein's income from the partnerships, authorized the Bank to sell his partnership interests, and authorized the Bank to sell his Carriage Services stock, as well. PX 4 at 5–6.

"failing or refusing to divulge information to which creditors were entitled." *Hayes,* 229 B.R. at 253; *see also Scott,* 172 F.3d at 959 (noting that concealment includes "preventing discovery" or "transferring or withholding knowledge or information required by law to be made known"); *cf. Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1293 n. 1 (10th Cir.1997)(finding no concealment where debtor had not "attempted to hide" transaction).

▮ A concealment will be found when a debtor purports to transfer an asset, making it appear to the world that he no longer owns it, but in fact retains an interest in the asset. *McWilliams,* 284 F.3d at 794. Even when the debtor does transfer an asset, there may be a concealment if he continues to use the asset as his own. *See Rosen v. Bezner,* 996 F.2d 1527, 1532 (3rd Cir.1993)(stating that concealment may be present when there has been "a transfer of title coupled with retention of benefits of ownership"); *Friedell v. Kauffman (In re Kauffman),* 675 F.2d 127, 128 (7th Cir.1981) (per curiam) (holding that "transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment"); *Cullen Center Bank & Trust v. Lightfoot (In re Lightfoot),* 152 B.R. 141, 146 (Bankr. S.D.Tex.1993) (same).

There is no dispute here that in March 1997 Holstein purported to transfer "all" his assets, including his interests in the Wilmette Office Court and Bloomfield Hills partnerships, to Stackler. PX 3, Ex. C, ¶ 2. The Circuit Court concluded (and there is no dispute about this, either) that in July 1997, Holstein again purported to assign to Stackler "all of his individual assets." PX 3, Ex. E; PX 4 at 4, ¶ 19. But in fact, the Circuit Court found, Holstein retained an interest in both partnerships, an interest he continued to own as of October 2000 and over which he maintained control.[19] PX 4 at 2–3, ¶¶ 11, 13, 16. These findings—of a purported asset transfer together with a retention of an interest in the asset—are findings of a "concealment."[20] *See McWilliams,* 284 F.3d at 794.[21]

▮ Second, the Order establishes Holstein's concealment with the "intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 727(a)(2). Section 727 requires proof of actual intent. *McWilliams,* 284 F.3d at 790. Because there is rarely direct evidence of intent, however, intent may be inferred from the circumstances surrounding the debtor's conduct. *In re Snyder,* 152 F.3d 596, 601 (7th Cir.1998). Courts have identified certain circumstantial factors, or "badges" of fraud, warranting the inference. *McWilliams,* 284 F.3d at 791. These include lack of consider-

19. Goldberg's complaint alleges that Holstein concealed several other assets: interests in Color Me Coffee and CMA Holdings. *See* Complaint, ¶ 46. The Circuit Court did not mention these assets in its Order. For purposes of Goldberg's 727(a)(2)(A) claim, however, it is enough that Holstein concealed the partnership interests. The court accordingly need not address whether Holstein concealed anything else.

20. If the Circuit Court's findings were not enough, nothing in the record shows that Holstein ever disclosed the retention of these interests, and Holstein never claims he did.

Indeed, years later Holstein continued to insist that he had transferred everything. DX 22 at 3–4.

21. Although the court in *Rosen* found it improper on summary judgment to infer "that the debtor retained a secret interest" in property merely from the debtor's "retention of the benefits of ownership," *Rosen,* 996 F.2d at 1532 n. 5, this case is not about "benefits." The Circuit Court's Order establishes that Holstein retained an actual ownership interest in the partnerships.

ation for a transfer; a familial or close relationship between the parties; the debtor's retention of possession, benefit, or use of transferred property; and the debtor's dire financial straits at the time of the transfer. *McWilliams,* 284 F.3d at 791; *see also Lightfoot,* 152 B.R. at 147.

In this case, the Circuit Court made several findings in its Order of "badges" of fraud. The Circuit Court found that Holstein and Stackler shared an intimate relationship; that Holstein transferred his assets to Stackler for less than "reasonably equivalent value"; that Holstein retained some of the property he purported to transfer; and that Holstein was insolvent and on the run from his creditors at the time. PX 4 at 2–4, ¶¶ 11, 13, 15–18. Holstein is, of course, precluded from contesting these findings. *Du Page Forklift,* 195 Ill.2d at 77, 253 Ill.Dec. 112, 744 N.E.2d at 849. The only possible inference here is that Holstein concealed his partnership interests with the intent to hinder, delay or defraud his creditors. No reasonable person could find otherwise.[22] *See Lightfoot,* 152 B.R. at 141 (noting that "just one" badge is sufficient to show intent, but that "the accumulation of several ... indicates strongly that debtor possessed the requisite intent").

Holstein has no quarrel with these conclusions. Instead, he invokes an narrow exception to the doctrine of collateral estoppel that allows an issue of law to be relitigated " 'to take account of an inter-vening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.' " *Du Page Forklift,* 195 Ill.2d at 79–80, 253 Ill.Dec. 112, 744 N.E.2d at 850 (quoting *Restatement (Second) of Judgments* § 28(2) (1982)). Holstein insists that his bankruptcy "was an intervening factor" that "changed the legal context between all of the parties."

It was not. First, Holstein misinterprets the phrase "legal context" in the Restatement exception. The exception concerns a change in "legal standards," a "new interpretation of the law," that takes place between the two actions. *Restatement (Second) of Judgments* § 28 cmt. c; *see Montana v. United States,* 440 U.S. 147, 161, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (noting that the exception applies where there are "major changes in the law" and "modifications in controlling legal principles") (internal quotation omitted). Holstein identifies no change in "legal standards." The "change" he cites, his bankruptcy filing, was simply a change in his personal situation.[23] Second, that "change" was not an "intervening" one in any event. Holstein sought bankruptcy protection in June 2000. The decision that collaterally estops Holstein here, the Circuit Court's Order, was issued in October 2000, four months later. The Restatement exception is no help to Holstein.

---

**22.** The Circuit Court concluded that Holstein executed the July 1997 assignment with the "actual intention of hindering, delaying or defrauding Holstein's creditors, including the Bank." PX 4, ¶ 21. This is the same intent finding that section 727(a)(2) requires. *See* 11 U.S.C. § 727(a)(2). Although technically the Circuit Court's finding concerned the transfer and not Holstein's retention and concealment of his interest in the partnerships, the transfer, retention and concealment were all part of a single scheme.

**23.** Holstein presumably would not contend that a change in "legal context" had occurred, preventing the Circuit Court's order from having any collateral estoppel effect, if he had married, had a child, divorced, or been convicted of a crime and sent to prison, though all those events alter a person's "legal context" in the sense that they have legal ramifications. That Holstein filed bankruptcy is no more relevant.

The preclusive effect of the Circuit Court's Order, then, leaves no doubt that Holstein concealed property with the intent to hinder, delay or defraud his creditors for purposes of section 727. 11 U.S.C. § 727(a)(2)(A).

### 3. Continuing Concealment

▮ Although Holstein concealed property with the requisite intent, the question nonetheless remains whether he did so "within one year of the date of the filing of the petition," 11 U.S.C. § 727(a)(2)—here, between June 19, 1999 and June 19, 2000. And on this point, Holstein mounts more of a defense. He notes that the Circuit Court Order concerns events in 1997, three years before the bankruptcy. Fraudulent or not, Holstein says, his actions in 1997 are too remote to be relevant. They are "forgiven." *Kontrick*, 295 F.3d at 726.

▮ Holstein is mistaken. Under the doctrine of "continuing concealment," a concealment with the requisite intent will be found during the year before bankruptcy, even though the initial concealment occurred earlier, if the debtor allowed the property to remain concealed into the critical year. *Rosen*, 996 F.2d at 1531; *see also Keeney*, 227 F.3d at 684; *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir.1997); *Kauffman*, 675 F.2d at 128; *McNichols v. Shala (In re Shala)*, 251 B.R. 710, 713–14 (N.D.Ill.2000). The doctrine recognizes that the failure to reveal property previously concealed can be "considered culpable conduct during the year before bankruptcy warranting a denial of discharge." [24] *Rosen*, 996 F.2d at 1527; *Hayes*, 229 B.R. at 259–60.

"Continuing concealment" aptly describes Holstein's conduct. Although his concealment of the two partnership interests began in 1997 when he pretended to transfer them to Stackler, it continued into the year preceding Holstein's bankruptcy. Around the beginning of May 1999, Holstein testified at the Bank's citation proceeding that he had transferred all his assets, including the partnership interests, to Stackler. *See* DX 22 at 11, 22. That remained his position in September 2000 in response to the Bank's motion (and eventual complaint) for turnover. *See* DX 25 (9/13/00 Tr. at 26). In January 2000, just six months before he filed bankruptcy, Holstein submitted a verified statement of personal assets and liabilities in the HMK bankruptcy declaring that he owned no partnership interests and received no annual income from partnerships. PX 3, Ex. Q at 3, 4.

Holstein's concealment continued even after his bankruptcy filing. In the schedules that accompanied his June 2000 bankruptcy petition, Holstein again failed to list his interests in the two partnerships, PX 3, Ex. A; PX 11 at 42–43, and he testified falsely at the meeting of creditors that his schedules included all his assets, PX 5 at 2. As late as his May 2002 answer to Goldberg's amended adversary complaint, Holstein still denied that he had "exercised ownership and control" over the partnership interests after the bogus assignments

---

**24.** Although the doctrine is "well-settled," *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 555 (5th Cir.1987), not everyone is enamored with it. *See Small v. Bottone (In re Bottone)*, 209 B.R. 257, 262–63 (Bankr. D.Mass.1997) (confessing a "lack of reverence" for the doctrine on the ground that it "elevate[s] circumstantial evidence to doctrinal status," construes exceptions to discharge broadly rather than narrowly, and violates the

Code's "fresh start" policy). The criticisms in *Small* are not well-taken. The doctrine is entirely consistent with the language of section 727(a)(2). By acknowledging that deception meant to frustrate creditors can begin more than one year before bankruptcy, the doctrine also enforces the Code's policy of limiting relief to the "honest but unfortunate debtor," *Grogan*, 498 U.S. at 287, 111 S.Ct. 654.

to Stackler in 1997. PX 1, ¶¶ 27, 34. *Cf. Hayes*, 229 B.R. at 261 (noting that the debtors' bankruptcy schedules "mask[ed] their retained interest" in property and so supported finding of concealment).

In short, the record on summary judgment demonstrates that Holstein continued to conceal his interests in the Wilmette Office Court and Bloomfield Hills partnerships into the year before his 2000 bankruptcy filing—and beyond. Nothing in the record shows that between 1997 and 2000 Holstein ever disclosed his interests to anyone. And Holstein, pointedly, does not contend he did.

Holstein argues, however, that there could not have been a concealment because the Bank was not misled. In 1999, Holstein disclosed the existence of the partnership interests when he testified at the citation proceeding that he had transferred them, and the Bank did not believe him, contending in its motion for turnover that Holstein still owned the interests. *See* DX 22 at 5–7, 11–12, 13.

■■■■ What the Bank believed is neither here nor there. The focus of section 727 is on the conduct and intent of the debtor, not the effect of that conduct on others. Harm to creditors is not an element of the statute. *McWilliams*, 284 F.3d at 793; *Snyder*, 152 F.3d at 601; *Krehl*, 86 F.3d at 744 n. 4. As long as the debtor commits the requisite act with an intent to hinder, delay or defraud creditors, he should be denied a discharge. "The statute does not provide that the creditors must have, in fact, been hindered, delayed or defrauded." *Smiley v. First Nat'l Bank (In re Smiley)*, 864 F.2d 562, 569 (7th Cir.1989); *see also Scott*, 172

F.3d at 968 (finding a concealment although creditors "did not ultimately rely on the representations" the debtor had made).

In *Hayes*, the court rejected the same argument Holstein makes here. Faced with a particularly aggressive creditor, DEPCO, the debtors in *Hayes* put their residence in a trust for the benefit of their children and then executed a "sham lease" that allowed the debtors to continue to live in the residence, supposedly as rent-paying tenants. *Hayes*, 229 B.R. at 254–55. Because DEPCO learned about the transfer long before the bankruptcy case through disclosures in financial statements and in affidavits the debtors filed in an action DEPCO had brought, *id.* at 255, the debtors argued that there had been no "concealment" for purposes of section 727(a)(2)(A).

But the *Hayes* court dismissed this argument, finding what DEPCO might have known to be irrelevant. Citing *Smiley*, the court explained "that a correct application of § 727(a)(2)(A)'s concealment element must focus on debtor's wrongful conduct, rather than on the extent to which creditors are successfully misled." *Id.* at 261. "We see no reason," the court said, "why dishonest debtors blessed with insightful creditors should fare better than those whose creditors are obtuse." *Id.*

This court agrees with *Hayes*. Just as the debtors in *Hayes* could not evade DEPCO's objection to discharge, Holstein cannot escape Goldberg's objection because a single aggressive creditor happened to be perspicacious enough to suspect that Holstein was up to something.[25]

---

25. Holstein gets no credit for having at least disclosed the transfer. Disclosing the transfer but not the retained interest is the kind of "sleight-of-hand that typifies transactions of this ilk." *Hayes*, 229 B.R. at 261. Like the record in *Hayes*, a case similar to this one in several respects, the record here contains "an extensive evidentiary recipe for deception and concealment within the year preceding bankruptcy." *Id.* at 261.

Holstein, though, denies he was up to anything. He claims that he "actually thought that he no longer owned those assets." It was not until the Circuit Court issued its October 19, 2000 Order, Holstein says, that he learned differently.

The record on summary judgment rapidly dispels any such notion. The Circuit Court's Order establishes—conclusively, *Du Page Forklift*, 195 Ill.2d at 77, 253 Ill.Dec. 112, 744 N.E.2d at 849—that Holstein owned the partnership interests in 1997, continued to own and exercise control over them after pretending to transfer them to Stackler, still owned them as of October 2000, and between 1999 and 2000 received thousands of dollars in partnership income that he paid Stackler. PX 4 at 2–3, ¶¶ 11–14, 16. And as if the findings in the Order were not enough, Goldberg has supplied copies of actual post–1997 checks to Holstein from the Bloomfield Hills partnership, checks Holstein endorsed to Stackler. PX 3, Ex. Q.

No trial is necessary to reject the suggestion that all the while he was receiving partnership checks and endorsing them to his lover, Holstein—a licensed attorney for nearly 40 years[26]—"actually thought" he owned no interest in the partnerships, only achieving enlightenment on the subject three years later at the hands of the Circuit Court. If Holstein still controlled the partnership interests after 1997 and from 1997 to 2000 paid the income from them to Stackler, Holstein plainly knew he owned the interests. His contrary assertion, frankly, is preposterous. Preposterous factual assertions will not prevent summary judgment. *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998) (holding that summary judgment is proper, despite a debt-

or's self-serving testimony of his honest intent, where the testimony is "utterly implausible in light of all relevant circumstances"); *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435 (Bankr.N.D.Ill.2002) (citing *Chavin* and granting summary judgment where no factfinder "[c]ould credit Debtor's statements for why he acted as he did").

The undisputed evidence, then, is more than adequate to show that Holstein not only concealed his partnership interests with the requisite intent in 1997, but that he continued to conceal them with the same intent immediately before his bankruptcy and thereafter. Nothing but Holstein's utterly implausible "actual belief" has been offered in opposition. The facts show a continuing concealment. *Lawson*, 122 F.3d at 1237 (noting that continuing concealment will be found where debtor transfers property and "retains a secret benefit of ownership in the transferred property within the year prior to filing").

### IV. Conclusion

■■■■ The discharge is "the heart of the fresh start provisions of the bankruptcy law." *Rosen*, 996 F.2d at 1531 (internal quotation omitted). Denying a debtor a discharge is therefore "an extreme step," one "not to be taken lightly." *Id.* The benefit of discharge, however, is for the "honest but unfortunate debtor," *Grogan*, 498 U.S. at 287, 111 S.Ct. 654, and Holstein is neither. Goldberg has produced evidence establishing a prima facie case under section 727(a)(2)(A) that on the eve of bankruptcy Holstein concealed property to frustrate creditors, and Holstein has countered with no evidence generating any factual issue and warranting a trial.

---

**26.** Holstein was admitted to practice law in Illinois in 1962. His admission is a matter of public record, *see* www.iardc.org, and the court can take judicial notice of it. *See* Fed.

R.Evid. 201(c); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir.2003) (holding federal court may take judicial notice of information on official government web site).

Goldberg is accordingly awarded summary judgment on Count I of the amended complaint. Holstein's cross-motion for summary judgment on that count is denied. Debtor Robert A. Holstein will be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A). A separate order will be entered consistent with this opinion.