In re Rocco V. PISCIONERI, Debtor.

SULPHUR PARTNERSHIP, et al., Plaintiffs,

v.

Rocco V. PISCIONERI, Defendant.

Bankruptcy No. B88–01678(3).
Adv. No. B88–0391.

United States Bankruptcy Court,
N.D. Ohio, E.D.

Dec. 11, 1989.

L. Stewart Hastings, Jr., Cleveland, Ohio, for plaintiffs.

Stephen D. Hobt, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

The Plaintiff, Sulphur Partnership (Sulphur) seeks a determination of the dischargeability of certain debts allegedly owed by Rocco V. Piscioneri (Debtor) and also objects to the Debtor receiving a discharge in bankruptcy. Following a trial of this adversary proceeding, the following findings and conclusions are hereby reached:

### I.

Sulphur is an Ohio general partnership whose principal business is that of owning a shopping plaza in Sulphur, Louisiana. Co-plaintiffs, Yazoo Partnership (Yazoo), Pearisburg Partnership (Pearisburg), Franklin Partnership (Franklin), and Fairfield Partnership (Fairfield) are all Ohio limited partnerships which are located in Yazoo, Mississippi, Pearisburg, Virginia, Franklin, Virginia, and Pensacola, Florida, respectively. Co-plaintiff BWI Corporation (BWI) is an Ohio partnership with its business operation located in Sulphur, Louisiana (Hereinafter collectively referred to as "the Plaintiffs"). Each Co-plaintiff is in the principal business of owning a shopping plaza in the above-mentioned locations. The Debtor, with his principal place of business located in Cuyahoga County, Ohio, was retained by each of the Plaintiffs herein to manage and operate their respective shopping plazas. The Debtor's managerial

duties were inclusive of rental collections from commercial tenants, the payment of mortgage installments to lenders, and the payment of taxes and other obligations of the several shopping plazas. Following an alleged breach of these duties, and the Debtor's filing of his petition for relief under Chapter 7, this adversary proceeding ensued.

## II.

The Plaintiffs contend that the Debtor, while acting in a fiduciary capacity on their behalf, collected on accounts payable and failed to pay their respective mortgage payments, taxes and other expenses for which they were obligated. They further contend that the Debtor received monies paid on their accounts payable and wrongfully converted those funds for other unauthorized purposes and to his own use. They assert the Debtor's conduct in this regard was willful, fraudulent, and malicious causing them to sustain unnecessary interest charges and late penalty assessments to their mortgage holders and various taxing authorities. Damage claims to each of the Plaintiffs were estimated and alleged as follows:

| | |
|---|---:|
| Sulphur | $ 95,000.00 |
| Yazoo | 30,000.00 |
| Pearisburg | 95,000.00 |
| Franklin | 120,000.00 |
| BWI | 12,500.00 |
| Fairfield | 45,000.00 |
| Total | $397,500.00 |

In objecting to a discharge for the Debtor, the Plaintiffs state that the Debtor, with an intent to hinder, delay, or defraud his creditors, has transferred or otherwise disposed of or concealed his assets within one year prior to seeking relief in bankruptcy. They further assert that he has failed to explain satisfactorily his loss of assets. Lastly, the Plaintiffs state that the Debtor has failed to completely account for the receipts and disbursements made on their behalf upon their demand.

In response to those several allegations, the Debtor plead general denials to most allegations and specifically denied others. Particularly, he denies being indebted to any of the Plaintiffs, denies that an ac-counting is due them, and contends that they lack authority and standing under any partnership agreement to bring the within action.

## III.

The dispositive issues are as follows: (1) whether the Debtor acted in a fiduciary capacity in his relationship with the Plaintiffs; (2) if determined to have been a fiduciary, whether the Debtor perpetuated an act of fraud or defalcation while acting in a fiduciary capacity, or embezzlement or larceny; (3) whether the Debtor committed a willful or malicious injury to the Plaintiffs or to their properties; (4) whether the Debtor transferred, removed, destroyed, concealed, etc., property of the Debtor within one year prepetition with an intent to hinder, delay or defraud a creditor or an officer of the estate; and (5) whether the Debtor has failed to explain satisfactorily any loss of assets. In considering the resolution of these issues the requisite burden of proof must be assessed and allocated. In dischargeability issues under § 523(a)(2), the burden of proof is upon the objecting party and must be met by clear and convincing evidence. The same is true of § 523(a)(4) issues. *In re Bosselait,* 63 B.R. 452, 457 (Bankr.E.D. Va.1986); *In re Black,* 787 F.2d 503, 506 (10th Cir.1986).

### The Limited Partnerships' Shopping Centers

A review of the evidence reveals that the Debtor, a real estate broker and salesman, possessed extensive experience in the real estate industry. In 1976, the Debtor and another partner formed Sulphur. His wholly-owned company, Neri Company (NC), managed the shopping center owned by Sulphur. The managerial duties of NC involved the collection of rents and paying the related expenses. Sulphur earned sufficient profits to pay its expenses. In 1985 and 1986, per the Debtor's direction, NC discontinued paying Sulphur's expenses. Instead, NC used the revenues from Sulphur's shopping center for other unrelated purposes. (See, Cross-exam, Debtor).

During this time period the Debtor was aware that bank account late fees and tax penalties were being assessed against Sulphur. (See, Ex. B). The Debtor's testimony relative to the sale of Sulphur was equivocal. In one instance, he testified that he was not aware that Sulphur was sold in order to defray tax obligations. Yet, in another moment, he testified that Sulphur was not sold for taxes but, rather, its certificates were sold. Impeached testimony revealed that he was uncertain whether he had informed the Sulphur limited partners about the late fee assessments. Similarly, his impeached testimony indicated he was not certain whether he had informed Sulphur's limited partners regarding the defaulted mortgage payments. He unequivocally testified that he did not inform Sulphur's limited partners of NC's unauthorized use of Sulphur's shopping center revenues as he knew that any prior request for the intended use of those funds would have been denied by Sulphur's limited partners.

The testimony of the Debtor also revealed that he was the sole shareholder, board chairman and sole officer of another entity known as Neri Development Company (NDC). NDC was the sole owner of a development known as the Chicago Heights Project (CHP) and continued that ownership until December, 1985 or January, 1986. The Debtor testified that he diverted funds from Sulphur and other projects managed by NC in order to subsidize CHP. He was not certain how many funds were diverted for this purpose. He stated that NC used funds belonging to Sulphur and other projects managed by NC in order to subsidize CHP. He was not certain how many funds were diverted for this purpose. He further testified that NC used funds belonging to Sulphur and others for its own use. The Debtor also is the sole shareholder, sole director and chief executive officer of NC.[1]

In 1985, the Debtor consolidated the revenue accounts of Sulphur, Yazoo, Fairfield, BWI, Franklin, Pearisburg, and others with the NC management account. Upon consolidation, all rental revenues were deposited into the NC management accounts. Expenses, to the extent they were paid, were also paid from that account. The Debtor's impeached testimony revealed that salaries were paid to certain of his family members and were paid from this account. NC also paid certain personal expenses of the Debtor. A 1984 tax return filed on behalf of NC indicated that a loan of $233,932.00 was made to the Debtor from NC funds (Ex. Y, p. 4). Also, the tax return revealed that a total of $19,984.00 was expended from NC funds for the lease-purchase of several automobiles for the Debtor, his wife, son, and one Manchura. Reimbursed fees for travel and entertainment were also reported. The 1985 tax return of NC (Ex. Z) revealed a reported loss of $347,202.00. Both in 1985 and in 1986, the Debtor drew heavily against the NC management account. A certified statement and the NC balance sheet as of September 30, 1986 (Ex. PB) revealed a net loss of $116,763.60.

Yazoo was the owner of a shopping center located in Yazoo, Mississippi which was managed by NC. The amount of funds reportedly segregated in the NC management account for Yazoo was $20,000.00, according to the Debtor. NC collected rents on behalf of Yazoo. NC, as manager, was to pay Yazoo's shopping center expenses and mortgage note payments. The Debtor testified that NC defaulted on those obligations at his direction and control.

NC had similar obligations as the manager of a shopping center owned by Pearisburg Partnership (Pearisburg), located in Pearisburg, West Virginia. NC was to pay Pearisburg's mortgage payments, taxes and other expenses pertaining to the shopping center. NC defaulted on those obligations at the Debtor's direction reportedly due to a lack of sufficient revenues generated by Pearisburg. During this default period, it is uncontested that NC had account funds belonging to Pearisburg in an

---

1. The Debtor testified that both NC and NDC are presently inactive, and that NC's franchise fee has not been paid since 1987.

estimated amount of $95,000.00. The Debtor testified that NC was without sufficient funds to repay either Yazoo or Pearisburg for their depleted funds which were contained in NC's account.

Franklin is another entity which the Debtor managed through NC. As occurred with Pearisburg and Yazoo, the Debtor caused NC to default on its payment obligations respecting Franklin. In 1986, NC collected rents from Franklin's shopping center tenants but failed to pay Franklin's mortgage, tax and other expense obligations at the Debtor's direction. Ultimately, in November of 1986, Franklin's property was sold as a result of foreclosure, with delinquent obligations being paid from sale proceeds. Remarkably, the Debtor testified that he did not inform Franklin's partners of the pending foreclosure prior to the sale. He also testified that he did not notify Sulphur's partners of the foreclosure action against Sulphur's shopping center until late into the foreclosure proceeding. Franklin was never reimbursed totally for its loss. As of December 31, 1986, NC should have had on its account an amount of $122,713.75 owing to Franklin. Simply stated, the Debtor testified that there were no funds in the NC management account to cover those funds.

Regarding BWI Partnership (BWI), BWI owned a parcel of land in Louisiana with commercial tenants under lease. As occurred with the above creditors, NC collected BWI's rents but failed to pay the mortgage, tax and other expense obligations of BWI. Among payments made from BWI funds held in the NC management account was a $20,000.00 loan to Keith Haig, a BWI partner. The Debtor testified he could not recall if the $20,000.00 loan was owed to him personally or was owed to BWI.

Fairfield Village Limited Partnership (Fairfield) was another entity which owned a shopping center known as Fairfield Village located in Pensacola, Florida. Purchased by NC from Fairfield in 1984, NC owned and managed Fairfield Village. Prior to the 1984 acquisition by NC, NC managed the shopping center for Fairfield and was responsible for rent collections, mortgage and tax payments, in addition to other operational expenses of Fairfield Village. Although revenues were received by NC those financial obligations were not paid by NC. Fairfield's 1987 statement of assets and liabilities (Ex. Q) reflects that $49,711.01 was due from NC. The Debtor testified that at the time of the 1984 purchase, NC owed no amount to Fairfield. Testimony of the partnerships' accountant (Monastra) revealed however that NC actually owed between $15,000.00–$20,000.00 to Fairfield prior to the 1984 sale. It is uncontested that that amount was never paid to Fairfield.

Testimony was also rendered by Carl J. Monastra (Monastra). Mr. Monastra, a certified public accountant, was the accountant for the subject partnerships and prepared, *inter alia*, their respective tax returns and financial reports (See Exs. B, D, F and I). His financial statement prepared for Pearisburg, as of December 31, 1987 indicated that NC held $90,603.90 of Pearisburg funds (Ex. F). Regarding Fairfield (Ex. I), NC owed an amount of $122,713.75 to Fairfield as of December 31, 1986. (See, Ex. 10). Monastra also testified that he, as the accountant, advised the Debtor to maintain separate partnership accounts rather than have one master account. The Debtor refused to do so. The Debtor was forced to resign as a general partner in late 1986. He does not know if the amounts owed by NC to Fairfield were ever reconciled.

The testimony of Manouchehr Salehi (Salehi), an entrepreneur, revealed that he is the largest general partner in Sulphur and has served since 1986 as its property manager and managing general partner. He attended three Sulphur partnership meetings during the latter months of 1986 wherein the Debtor informed those in attendance that the business affairs of Sulphur were in order. At the second meeting, Salehi testified the Debtor informed them that he would reimburse Sulphur for the late payments and penalties it was required to pay and further agreed to separate the Sulphur account from other accounts handled by NC. At the third meeting, the Debtor's legal counsel (Lowenthal) was made aware of nonpayments by the

Debtor regarding Sulphur, whereupon Lowenthal advised the Sulphur partners that the Debtor converted certain funds belonging to Sulphur. As a result of having to make double mortgage payments to its lender, the Sulphur mortgage arrearages have since been cured and deferred maintenance costs are current. In total, Sulphur paid $7,086.54 in penalties due to NC's failure to pay on Sulphur obligations (See, Ex. 11 for summary of late payment charges from 1984–1987).

Salehi further testified that he also is the property manager and managing general partner of Yazoo. Yazoo was required to pay late charges totalling $3,848.17 as a result of NC's failure to pay its obligations.[2] Franklin paid late charges of $11,155.09 as a result of NC's failure to timely pay its obligations between 1984 and 1987. As a partner in BWI, he was not informed prior to the $20,000.00 loan being made to Keith Haig from BWI funds and disputed that any partner authorized the loan to be charged against BWI funds. Regarding the existence of management agreements, he testified that an agreement existed between Sulphur and NDC. He was uncertain if management agreements existed for Yazoo, Pearisburg, or BWI. Although he was aware that NC received rental revenues from the shopping centers owned by the partnerships, he had no knowledge whether NC deposited those funds in accounts other than the NC account.

### IV.

The Plaintiffs allege nondischargeability based upon §§ 523(a)(4), 523(a)(6) and object to the Debtor's discharge pursuant to §§ 727(a)(2) and 727(a)(5) of the Bankruptcy Code. Considering the dischargeability of a debt under § 523(a)(4), it is clear that the provision requires the existence of a fiduciary relationship regarding fraud or defalcation.

Also under § 523(a)(4), the discharge of a debt could be denied for embezzlement or larceny.[3] An examination of the evidence and the record, generally, reveals no fiduciary relationship existing between the parties herein. In order for such a relationship to exist within the context of § 523(a)(4) there must be present an express or technical trust. Implied trusts are not to be recognized under § 523(a)(4). See, *In re Johnson*, 691 F.2d 249, 251 (6th Cir.1982); citing, *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934); *In re Stone*, 91 B.R. 589 (D.Utah 1988); *In re Napoli*, 82 B.R. 378 (Bankr.E.D.Pa.1988). Although the definition of "fiduciary" must be construed under federal law, state law may be examined to determine when a trust relationship exists. *Johnson supra* at 251. *In re Clemens*, 83 B.R. 945 (Bankr.N.D.Ohio 1988). Herein, the record reflects that a management contract was executed between the partnerships and NC. No express or technical trust relationship was ever created between the Debtor and the plaintiff partnerships. Therefore, no fiduciary relationship can be established. Even, *arguendo*, if the corporate veil of NC was pierced to reach the Debtor as sole shareholder, a fiduciary relationship cannot be constituted under § 523(a)(4). Section 1775.20(A) of the Ohio Revised Code provides:

(A) Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property. O.R.C. § 1775.20(A).

Even upon construing the above state law provision respecting the accounting obligation of a partner to the partnership, the following four-prong test for a fiduciary

---

**2.** Salehi is also a vice-president of EASACO Corporation which has an assignment of the Plaintiffs' interests regarding the Debtor in this action, according to Salehi's testimony.

**3.** 11 U.S.C. 523. Exceptions to discharge.

(a) A discharge under 727 ... of this title ... does not discharge an individual debtor from any debt—
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. 11 U.S.C. 523(a)(4).

relationship fails to create a fiduciary duty in the matter at bar:

1. the existence of an applicable state statute;
2. which defines the trust *res.;*
3. which defines the fiduciary duties;
4. and imposes a trust on funds prior to the act giving rise to the debt.

(See *Johnson, supra,* at 253.)

Under the above test, when viewed against the requirements of § 1775.20(A), O.R.C., no fiduciary relationship exists, even where the corporate veil of NC is pierced. Although § 1775.20(A) is a state law provision which imposes a trust on funds prior to the act giving rise to the subject debts, in the instant case clearly defined fiduciary duties are lacking, as well as a sufficiently defined trust *res.* Without the existence of a fiduciary capacity, it becomes unnecessary to further address fraud or defalcation under § 523(a)(4) of the Code. See, Legislative History, H.R. 8200, 95th Cong., 1st Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

The remaining bases for nondischargeability under § 523(a)(4) are embezzlement or larceny. Clearly larceny is inapplicable and, otherwise, has not been sufficiently demonstrated in the record. Larceny has been defined as the fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use without the consent of the owner and with an intent to permanently deprive the owner of such property. Embezzlement, however, is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. *In re Michel,* 74 B.R. 80 (Bankr.N.D.Ohio 1985), *aff'd.,* 74 B.R. 88 (N.D.Ohio 1986). In the present matter, the Debtor lawfully possessed the revenues which came into his possession as manager for the several partnerships' shopping centers. Regarding Sulphur, the Debtor was one of several partners of that limited partnership (Ex. 8, Partnership Agreement of SP). Additionally, he was the sole shareholder, officer and director of NC which was under contract with the complaining partnerships to manage the subject shopping centers. Upon closer examination, it is clear that the Debtor had total control over and directed all actions of NC. Thusly, an allegation of larceny cannot be sustained under § 523(a)(4). For the aforementioned reasons, however, the allegation of embezzlement is considered with merit. As indicated above, the record is clear to support a finding that revenues lawfully came into the Debtor's possession under the management agreement between Sulphur and NC, the Debtor's wholly-owned company. The Debtor, both as a Sulphur partner and as the sole shareholder and officer of NC, knew that the revenues received were to be used for the payment of mortgage, tax and other operating expenses. (Ex. 8, Sulphur Partnership Agreement, p. 8; *Id.,* Mgmt. Agreement, dated 12–3–76 between Sulphur and The Mitchell Company, co-executed by the Debtor). As alleged, and it is hereby found, he converted some of the Sulphur revenues to his personal use, rather than pay the aforesaid obligations of Sulphur. Such conduct constitutes an act of embezzlement, as the conversion of the rental revenues occurred intentionally and was without the consent of Sulphur, the owner of those assets. Specifically, such conduct effectively bars the discharge of any debt created as a result of the wrongful conduct. 11 U.S.C. 523(a)(4). The Debtor acted without authority in converting the partnership assets to his own use. Upon piercing the corporate veil, it is a well-established maxim that one cannot use a third party to do that which is unlawful for one to do directly. It is apparent that the Debtor used NC to wrongfully convert assets belonging to the several partnerships which had hired NC as the managing agent for several shopping centers. Moreover, the evidence reveals that the Debtor was a partner in the following plaintiff partnerships: Sulphur, Yazoo, Pearisburg, Franklin and Fairfield. (See, Exs. C, E, G, J, K, L, D and P). The record is silent regarding any partnership interest by the Debtor in BWI. Accordingly, the claims of these plaintiffs, subject to an accounting, are hereby found to be nondischargeable.

■ Next, the issue of nondischargeability of debt is examined under § 523(a)(6).[4] That statutory provision effectively bars the discharge of a debt for willful or malicious injury perpetuated upon another or upon another's property. "An injury to an entity or property may be a malicious injury within the context of § 523(a)(6) if it was wrongful and without just cause or excuse. Personal hatred, spite or ill-will are not required elements under this exception to debt dischargeability. 3 *Collier on Bankruptcy*, ¶ 523.16, 15th Ed. Further, "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987), citing *Collier, supra.* Malice may be implied or constructive. *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1262–63 (11th Cir. 1988); *In re Lee*, 90 B.R. 202, 207, 18 B.C.D. 183 (Bankr.E.D.Va.1988). The word "willful" means "deliberate or intentional," *Collier, supra*, at ¶ 523.17. "Injuries within the meaning of § 523(a)(6) are not confined to physical damage or destruction; but an injury to intangible personal or property rights is sufficient." *Id.* at 523–118.

■ At bar, the evidence reveals that the Debtor used his wholly-owned property management company, NC, to receive the Plaintiffs' rent receipts. Those revenues were, in part, to be used for paying the respective mortgage payments, taxes, etc. As the sole shareholder and director, the Debtor controlled NC. At his direction, NC received the rent revenues but the funds were not used to timely pay the mortgage, taxes, and other operational expenses as required under the management agreement between the Debtor and the several partnerships. Rather, the Debtor converted the funds received by NC to his personal use or for some other unauthorized purpose. The Debtor testified that he knew that penalties were being assessed for late mortgage payments and for nonpayment of tax obligations pertaining to Sulphur. The Debtor's conduct in this regard caused Sulphur's shopping center to undergo foreclosure proceedings before the Sulphur partners were eventually able to redeem their property from foreclosure in 1988, some two years after the foreclosure sale. The Debtor testified that he was uncertain whether he informed the Sulphur partners about the mortgage and tax payment defaults. This same type of nonpayment conduct was evidenced in the Debtor's management, through NC, of shopping centers owned by Yazoo, Pearisburg, Franklin, and Fairfield Village.[5] (See, Cross–Exam., Debtor). This conversion was both a willful and malicious act as it was done deliberately and intentionally. As a result of this conduct, the complainants were injured to the extent of the amounts wrongfully converted by the Debtor, in addition to the amounts they, respectively, were required to pay for mortgage late fees and tax penalties. (See, Ex. 12). The conversions were not only wrongful but were also made with insufficient justification or excuse. Thusly, the subject debts are hereby found to be nondischargeable, subject to further accounting.

### V.

Finally, the Court must determine whether the Debtor should be denied a discharge in bankruptcy. In seeking this relief, the Plaintiffs assert the provisions of §§ 727(a)(2) and (a)(5) of the Bankruptcy Code. Under § 727(a)(2), the Plaintiffs allege that the Debtor, with intent to hinder, delay, or defraud creditors has transferred, removed, destroyed, mutilated, or concealed property of the Debtor within one year prepetition. Under § 727(a)(2)(B), the Plaintiffs further allege that similar conduct has been perpetuated by the Debtor postpetition. Under § 727(a)(5), the Plain-

---

4. 11 U.S.C. 523(a)(6): "A discharge under section 727 ... does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity."

5. Questionable conduct by the Debtor regarding NC's management of BWI's property involved a $20,000.00 loan to one Keith Haag. The required permission for the Debtor to make that loan is disputed.

tiffs allege that the Debtor has failed to satisfactorily explain his loss of assets.

■ The proscribed acts addressed in § 727(a)(2) of the Bankruptcy Code must occur either within one year before the bankruptcy petition is filed or must have occurred postpetition. The particulars of this action reveal that the Debtor's bankruptcy case was filed in 1988. The several allegations complained of occurred much earlier than one year prepetition. None of the acts complained of occurred postpetition. Section 727(a)(2)(A) is not meant to reach all bad acts occurring prior to bankruptcy, only those occurring within the one-year limitation. Thusly, the record does not support a denial of a discharge under § 727(a)(2).

■ Section 727 is the heart of the fresh start provision of the bankruptcy law. See, *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). It provides under § 727(a) for the Court to grant a discharge to a debtor unless one of ten conditions is met. Its provisions are to be strictly construed. This section of the Bankruptcy Code is derived from § 14(c) of the former Bankruptcy Act. (H.R.Rep. No. 595, 95th Cong., 1st Sess. 384–385 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 98–99 (1978)). Under § 727(a)(5) a discharge must be granted unless the debtor has failed to satisfactorily explain any deficiency of assets to meet the debtor's liabilities. It is designed to compel an explanation of a loss of assets as a prerequisite to a discharge. Although § 727(a)(5) does not statutorily prescribe a limitation period for the defined conduct, it has been judicially described as placing a burden on the plaintiff to establish that "the debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case...." *In re Bernstein,* 78 B.R. 619 (S.D.Fla.1987). The burden of proof, which is to be borne by the complainant, is to be met with clear and convincing evidence, although § 727(a)(5) places a burden of production upon the debtor.

■ The record is clear to provide unrefuted evidence that the Debtor extract-ed funds belonging to the Plaintiffs for the purpose of subsidizing another failed business venture and for various unauthorized personal expenses. Although questionable in terms of business judgment, the Debtor's testimony in this regard was credible. Where a debtor's testimony in a § 727(a)(5) scenario is credible, a discharge must be granted unless the debtor's explanation reveals conduct otherwise prohibited by § 727. *Id.,* at 624, *citing, Shelby v. Texas Improvement Loan Co.,* 280 F.2d 349, 355 (5th Cir.1960) (holding, "A bankrupt is not to be denied a discharge on general equitable considerations. It can only be denied if one or more of the statutory grounds of objection are proved.") One commentator has stated that § 727(a)(5) requires that there be a satisfactory explanation of the loss of an asset, but does not require that the explanation be meritorious. W. Norton, 1 *Norton Bankr. L. & Practice,* § 27.20 at 27–39 (1982). The Plaintiffs have asserted a discharge denial based only upon § 727(a)(2), which is inapplicable, and upon § 727(a)(5). Under § 727(a)(5), the Plaintiffs have only stated the requirements of that section in a conclusory fashion. They have not made a *prima facie* case and, as a result, have failed to meet their burden of proof. Thusly, no sufficient ground has been established in the record to deny the Debtor a discharge under § 727(a)(5).

Accordingly, the specific debts addressed in this adversary proceeding are hereby adjudged to be nondischargeable. The objections to the discharge of the Debtor are hereby overruled.

IT IS SO ORDERED.