**In re Allan M. OLBUR, Debtor.**

**Sheila Cohen and Rhona Bernau, Plaintiffs,**

**v.**

**Allan M. Olbur, Defendant.**

**Bankruptcy No. 03 B 13958.
Adversary No. 03 A 2190.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 1, 2004.

David E. Cohen, Chicago, IL, Attorney for Sheila Cohen and Rhona Bernau.

Allan M. Olbur, Pro se.

### MEMORANDUM OPINION

A. BENJAMIN GOLDGAR, Bankruptcy Judge.

Businessman and consultant Allan M. Olbur had fallen on hard times. After several of his business ventures failed in

the late 1990s, Olbur found himself defending a state court action brought by two former employees. Right before the action went to trial in March 2003, Olbur transferred his interest in his house to his wife and son. Right after judgment in the action was entered against him, Olbur filed a hastily prepared, error-ridden petition for relief under chapter 7 of the Bankruptcy Code.

In July 2003, the two former employees brought a five-count adversary complaint against Olbur in his bankruptcy case. Two of the counts (Counts IV and V) sought to have his debts to the former employees declared non-dischargeable under section 523(a) of the Code, 11 U.S.C. § 523(a). The other three counts (Counts I through III) asked to have Olbur denied a discharge altogether under section 727(a), 11 U.S.C. § 727(a).

The court held a trial at which only two witnesses testified: Olbur himself and counsel for the employees in the state court action. At the close of all the evidence, the court granted the former employees' motion to dismiss their section 523(a) counts and proceed only on the section 727(a) claims. The court now makes the following findings of fact and conclusions of law. For the following reasons, the former employees are entitled to judgment on Counts I and II of their complaint. Olbur will be denied a discharge.

## 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(J). The court may therefore enter a final judgment. *In re Smith,* 848 F.2d 813, 816 (7th Cir.1988).

## 2. Findings of Fact

### a. Allan Olbur

Olbur is an educated man with a thirty-year business background. He holds a B.S. in accounting from DePaul University (Tr. at 6, 109),[1] as well as a degree from the Spertus Institute (*id.* at 6).

After obtaining his accounting degree in 1973, Olbur spent six years with a liquor distributor, Continental Distributing Company, where he worked in the marketing department. (*Id.* at 109). He also did some inventory control work and "established an on-line cash application system" with the data processing department. (*Id.*). Following the Continental stint, Olbur went to work for a small telephone company, Computel, negotiating contracts for the sale of private telephone systems. (*Id.* at 110–12).

At some point, Olbur took the technological expertise he gained at Computel and struck out on his own. He met with little success. In 1992, he incorporated a company called AMO Cable & Contracting of which he was the "hundred-percent owner." (*Id.* at 8). AMO ceased operations at the end of 1997.[2] (*Id.*). Olbur next was associated with a company called Infrastructure Technologies of which he was also the "hundred-percent owner." (*Id.*). The life of Infrastructure Technologies was even briefer: 1998 until 2001.[3] (P.Ex.

---

1. The trial transcript is cited in this opinion as "Tr. ____." The plaintiffs' exhibits are cited as "P.Ex. ____." The parties' joint list of stipulated facts is cited as "Jt. Stip. ____."

2. In his bankruptcy schedules, Olbur reported a disputed liability to the Internal Revenue

Service of more than $540,000 in unpaid payroll taxes for AMO. (P.Ex. 4 at 9).

3. These dates come from Olbur's statement of financial affairs. At trial, Olbur testified that Infrastructure Technologies was incorporated in 1996 and ceased doing business in 1997.

4 at 21). In 2000, Olbur was an officer (but not an owner) of Legacy Network Services. (Tr. at 10). By 2001, it too was defunct. (*Id.* at 11). Another entity Olbur incorporated but did not own, IP Appliance, never transacted business at all. (*Id.*). By May 2004 (the time of trial), Olbur had been unemployed for roughly three years. (*Id.* at 7).

### b. The State Court Action

In 2001, two former employees of AMO and Infrastructure Technologies, Sheila Cohen and Rhona Bernau, brought an action against Olbur and Infrastructure Technologies in the Circuit Court of Cook County. (Tr. at 65; P.Ex. 2 at 5; P. Exs. 11–15). The nature of the action was never disclosed here, but Cohen and Bernau together sought a judgment of $50,000. (Tr. at 65).

The action was eventually settled with a settlement agreement that gave the plaintiffs relief in the event of a breach. (*See id.* at 66). At some point, possibly May 20, 2002 (*see* P.Ex. 11), it appears the settlement agreement was also breached: counsel for Cohen and Bernau testified that on November 7, 2002, the circuit court entered a judgment against Infrastructure Technologies for breach of the agreement. (Tr. at 66). The court continued the claim against Olbur to January 29, 2003 for a "trial readiness" conference and set the matter for trial on February 18, 2003. (*Id.* at 66–67; Jt. Stip. at 3; P.Ex. 11).

January 29 arrived. At the conference, the court asked about settlement. (Tr. at 67). Olbur, who was *pro se*, insisted the obligation belonged solely to the corporation. The court quickly disabused him of this notion, telling him that "he was being sued individually," that "he had substantial exposure and that he should reconsider whether he want[ed] to settle." (*Id.* at 67;

Jt. Stip. at 3). In the order entered after the conference, the trial date remained the same: February 18, 2003. (Tr. at 67; Jt. Stip. at 3; P.Ex. 12).

On February 18 itself, though, the judge was unavailable, and the trial had to be continued to March 4. (Tr. at 68; P.Ex. 14). The continuance was unexpected. Because no order continuing the trial had been entered between January 29 and February 18, and because no request to continue the February 18 trial date had been made, Olbur could not have known the trial would not in fact be held on February 18 as scheduled. (Tr. at 68–69).

The trial took place on March 4, 2003. (*Id.* at 68; P.Ex. 15). Following trial, the circuit court entered judgment against Olbur, awarding Cohen $39,900 and Bernau $24,960. (Tr. at 15, 18; Jt. Stip. at 2; P.Ex. 15). Cohen and Bernau immediately began trying to collect the judgment. Two days after the entry of judgment, they had a citation to discover assets issued to Olbur requiring him to appear and be examined on March 14. (P.Ex. 10).

### c. The Transfer of the House

In 2003, Olbur and his wife owned a single family home in Buffalo Grove, Illinois. (P.Ex. 4 at 2). Legal title to the property was held by a land trust of which LaSalle Bank was the trustee. (Tr. at 48, 81; Jt. Stip. at 3). The Olburs each owned 50% of the beneficial interest in the land trust. (*See* Jt. Stip. at 4).

On February 13, 2003—a little over two weeks after the pre-trial conference in the circuit court action and five days before the February 18 trial date—Olbur executed an assignment transferring his portion of the beneficial interest in the land trust to his wife and son. (Tr. at 46; Jt. Stip. at 3; P.Ex. 13). Olbur received no money in the transaction. (Tr. at 49). It was Ol-

(Tr. at 9). The dates in the statement of

financial affairs seem more probable.

bur's intention in making the transfer to dispose of his ownership interest in his home (*id.* at 48–49), and from the time of the assignment until at least March 12, he believed he had done so (*id.* at 48, 50, 101, 106; Jt. Stip. at 4).

Some question, however, was later raised about the assignment's effectiveness. Although the assignees accepted the assignment (Jt. Stip. at 3; P.Ex. 13), and although the assignment was duly submitted to LaSalle Bank as trustee (Tr. at 46, 104), LaSalle Bank never acknowledged it (*id.* at 87, 103–04). When Olbur consulted a bankruptcy lawyer on March 12 in preparation for filing his petition in this case, he was told the transfer "was no good," that "it wouldn't mean anything at this point." (*Id.* at 102, 106).

Olbur explained the transfer as an innocent precursor to the refinancing of his mortgage. All through 2002, Olbur said, he had attempted to get new financing. (*Id.* at 82). He was rebuffed—told that financially he was "a pariah," a "black eye in terms of credit." (*Id.*). The purpose of transferring the beneficial interest in the land trust was to "get [his name] off" the property so the mortgage could be refinanced. (*Id.* at 84). Olbur believed the property was worth $340,000; with a mortgage of $240,000 (and some small tax liens (*see id.* at 96)), enough equity existed to induce a relative to take on a refinanced mortgage in exchange for the equity (*id.* at 84–85). That way, the Olburs could continue living in the house. (*Id.*).

No refinancing ever took place. The house was sold at foreclosure on February 26, 2004 for $275,000. (*Id.* at 52; P.Ex. 16). Despite Olbur's assignment of his beneficial interest in the land trust to his wife and son, an interest he admitted was never assigned back to him (Tr. at 51), the lawyer for the Olburs in the foreclosure action subsequently brought a motion asking to have the surplus from the sale turned over to both "Allan M. Olbur and Barbara R. Olbur" (P.Ex. 16).

### d. The Bankruptcy Petition and Schedules

On March 28, 2003, Olbur filed a petition for relief under chapter 7. (P.Ex. 3; Jt. Stip. at 2). His schedules were filed on April 4, 2003, one week later. (P.Ex. 4; Jt. Stip. at 2). Although they were prepared with the assistance of counsel, the petition and schedules contained numerous errors and omissions. Specifically:

a. Despite their recent judgment against Olbur, Cohen and Bernau were not listed on the creditor matrix accompanying the petition. (Tr. at 15, 17–18; Jt. Stip. at 2; P.Ex. 3 at 4). Cohen and Bernau also were not listed on Schedule F as creditors holding unsecured nonpriority claims. (Tr. at 30; Jt. Stip. at 2; P.Ex. 4 at 10). The circuit court action (though not the judgment) was disclosed in Olbur's statement of financial affairs, but Cohen and Bernau did not appear as creditors anywhere in the petition or schedules. (*See* P. Exs. 3, 4).

b. On Schedule B, where Olbur was required to itemize stock and interests in incorporated and unincorporated businesses, Olbur checked "none." (Tr. at 26; Jt. Stip. at 2–3; P.Ex. 4 at 4). In fact, Olbur and his wife owned several shares of stock in Commonwealth Edison and AT & T. (Tr. at 29–30; Jt. Stip. at 3).

c. Schedule I listed no income of any kind for Olbur or his wife. (P.Ex. 4 at 13). In fact, Olbur was receiving money from relatives. (Tr. at 31–32). In addition, his wife was working and providing him with money. (*Id.* at 32).

d. Schedule J listed no expenses at all. (*Id.* at 33; Jt. Stip. at 3; P.Ex. 4 at 14). In fact, Olbur had a monthly mortgage payment, real estate taxes, property insur-

ance payments, utility bills, grocery bills, medical bills, and other common expenses of the kind Schedule J requires a debtor to disclose. (Tr. at 33–39). Olbur admitted at trial that Schedule J was not a true and accurate reflection of his average monthly expenses. (*Id.* at 35).

e. Olbur's statement of financial affairs required him to list "each safe deposit box" in which he had "securities, cash or other valuables" within one year of the bankruptcy. (Tr. at 40; Jt. Stip. at 2; P.Ex. 4 at 19). Olbur checked "none." (*Id.*). He also checked "none" next to the item requiring him to list "all property which has been in the hands of a custodian" during the same period. (Tr. at 41; P.Ex. 4 at 18). In fact, from 1982 through at least March 1, 2004, Olbur and his wife were record owners of a safe deposit box at LaSalle Bank. (Tr. at 41; Jt. Stip. at 2). It contained the Commonwealth Edison and AT & T stock certificates, as well as a small coin collection. (Tr. at 44). The existence of the safety deposit box came to light only when counsel for Cohen and Bernau asked about it at the creditors meeting. (*Id.* at 79, 91).

f. Olbur's statement of financial affairs incorrectly stated that two of his failed enterprises, Legacy Network Services and IP Appliance, were still in business or had failed only recently. (P.Ex. 4 at 21).

Despite these errors, on March 27, 2003, Olbur signed the petition, declaring under penalty of perjury that the information he had provided was "true and correct." (Tr. at 13; Jt. Stip. at 2; P.Ex. 3 at 2). He also verified that the creditor matrix attached to the petition was "true and correct." (P.Ex. 3 at 3). On April 4, 2003, Olbur likewise signed the schedules, declaring under penalty of perjury that he had read them and that they were "true and correct." (Tr. at 21; Jt. Stip. at 2; P.Ex. 4 at 15). He made the same decla-ration about the statement of financial affairs. (Tr. at 23; Jt. Stip. at 2; P.Ex. 4 at 22).

These declarations were false. Information in the petition, schedules and statement of financial affairs was not true and correct. Nor did Olbur ever bother to read these documents in their entirety before he signed them, despite his certification under penalty of perjury that he had. (Tr. at 23–24, 92–93). Said Olbur: "I didn't even think about it." (*Id.* at 93). Indeed, Olbur acknowledged that he had not read the documents when his deposition was taken in February 2004. (*Id.* at 23–25). At trial, he conceded he still had not read them. (*Id.* at 25).

Olbur had an explanation for the omission of the safety deposit box and its contents. In January 2002, he said, the box had been put "under administrative lock" (presumably because the Olburs had not paid the rental fee). (*Id.* at 79). Because he no longer had access to it, he concluded he "had no ownership." (*Id.*). After the existence of the box came out at the creditors meeting, Olbur and the trustee gained access to it. (*Id.* at 42, 44, 80). Inside, they found documents for a townhouse Olbur no longer owned, as well as a small coin collection that the trustee inventoried and returned to Olbur. (*Id.* at 80). To Olbur's claimed surprise, they also found the stock certificates. These had originally belonged to his wife, he believed, and at some point she must have had him added as joint owner. (*Id.* at 79–80). He denied knowing about them before the trustee's inspection. (*Id.* at 81).

Olbur sought to downplay the errors in the petition and schedules, characterizing them simply as "a couple of minor things that were not put in the right place." (*Id.* at 15). He had disclosed everything to his attorneys, he said, and he believed his petition and schedules were complete.

(*Id.*). Olbur professed "surprise" at learning that "certain things perhaps were not done according to Hoyle," but he denied trying to conceal anything. (*Id.* at 77–78). He said the errors were made "inadvertently" (*id.* at 15, 16), and he ascribed them to the "haste" with which the petition and schedules were prepared and the pressure he was under (*id.* at 15, 114, 117). "I'd just like these folks to be sitting in my shoes [*sic*] at that time and understand what was going on," he remarked. (*Id.* at 114).

### 3. Conclusions of Law

Cohen and Bernau argue that Olbur is not entitled to a discharge under section 727 for three reasons. First, they say that he failed to explain satisfactorily any loss or deficiency of assets. 11 U.S.C. § 727(a)(5). Second, they claim that he transferred property—his beneficial interest in the land trust—within a year of the bankruptcy, and that in doing so he intended to hinder, delay or defraud his creditors. 11 U.S.C. § 727(a)(2)(A). Third, they contend that he knowingly and fraudulently made a "false oath" in connection with the case by declaring under penalty of perjury that his petition and schedules were accurate and that he had read them when neither was true. 11 U.S.C. § 727(a)(4)(A).

 Section 727(a) denies a discharge to debtors who have been unscrupulous in various ways. The bankruptcy system is intended to grant a discharge to the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (internal quotation omitted). A discharge is not available, however, to the debtor who has been "less than honest." *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The denial of discharge is a "drastic" remedy, and the objecting creditor must prove every element of its objections

to discharge by a preponderance of the evidence. *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D.Ill.2002).

Here, Cohen and Bernau did not prove the elements of their objection under section 727(a)(5). They did, however, succeed in proving their objections under sections 727(a)(2)(A) and 727(a)(4)(A). Judgment will therefore be entered in their favor.

#### a. Section 727(a)(5)

The evidence at trial did not show that Olbur should be denied a discharge under section 727(a)(5).

 Section 727(a)(5) bars a discharge when "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). By penalizing a debtor who is insufficiently forthcoming about what happened to his assets, section 727(a)(5) is one of several Code provisions meant to "relieve[ ] creditors and courts of the full burden of reconstructing the debtor's financial history and condition, placing it instead upon the debtor." *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson)*, 273 B.R. 538, 545 (Bankr.N.D.Ill.2002). Under this section, the bankruptcy court has "broad power to decline to grant a discharge . . . where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re D'Agnese*, 86 F.3d 732, 734 (7th Cir.1996) (internal quotation omitted).

 Proof under section 727(a)(5) comes in two stages. Initially, the objecting party bears the burden of showing that the debtor "at one time owned substantial and identifiable assets that are no longer available to his creditors." *Bostrom*, 286 B.R. at 364; *Hermanson*, 273 B.R. at 545. If this showing is made, the burden then falls on the debtor to offer a " 'satisfactory' explanation" for the unavailability of those

assets. *Hermanson*, 273 B.R. at 545 (internal quotation omitted); *see also Bostrom*, 286 B.R. at 364.

■ What explanation will be "satisfactory" rests with the court's discretion. *Bostrom*, 286 B.R. at 364. The debtor's account need not be "far-reaching and comprehensive," but it must amount to more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 901 (Bankr.N.D.Ill.2003) (internal quotation omitted). Nor is it necessary for the debtor to justify "the wisdom of the … disposition of assets." *Hermanson*, 273 B.R. at 545; *see also Bostrom*, 286 B.R. at 364. What is relevant is "the completeness and truth" of his explanation. *Costello*, 299 B.R. at 901. The debtor must explain in good faith "what really happened to the assets in question." *Community Bank of Homewood–Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 925 (Bankr.N.D.Ill. 1992).

The section 727(a)(5) claim here has three grounds. Cohen and Bernau assert that Olbur has not adequately explained the loss or deficiency of his interests in his former businesses, in the contents of his safe deposit box, and in the land trust.

■ As to the past businesses, Cohen and Bernau do not make it out of the starting blocks. Section 727(a)(5) itself prescribes no limitations period, but courts have held that the assets in question must at least have belonged to the debtor "at a time not remote in time to case commencement." *See Bernstein v. Carl Zeiss, Inc. (In re Bernstein)*, 78 B.R. 619, 622 (S.D.Fla.1987); *Straub v. Straub (In re Straub)*, 192 B.R. 522, 525 (Bankr.D.N.D. 1996); *Sulphur P'ship v. Piscioneri (In re Piscioneri)*, 108 B.R. 595, 604 (Bankr. N.D.Ohio 1989). This makes sense: a debtor should not be deprived of a discharge merely because he can no longer explain (or can explain but cannot document) a loss of assets years before the bankruptcy. How long ago is too long ago depends on the case; there is no hard and fast rule. *Hermanson*, 273 B.R. at 552.

■ The evidence concerning Olbur's former businesses showed losses too remote to support a section 727(a)(5) claim. The first business, AMO, ceased operations in 1997, six years before Olbur filed his bankruptcy petition. (Tr. at 8). The second, Infrastructure Technologies, ceased operations in 2001 (and possibly even earlier), at least two years before the bankruptcy. (*Compare* P.Ex. 4 at 21 *with* Tr. at 9). Olbur testified credibly that he owned no interests in his most recent ventures, Legacy Network Services and IP Appliance. (Tr. at 10–11). The losses of the interests in AMO and Infrastructure Technologies were simply too old to be relevant under section 727(a)(5). Cohen and Bernau therefore failed to show a loss that Olbur had to explain.

Cohen and Bernau do no better with Olbur's safe deposit box. The safe deposit box contained the coin collection, stock certificates, and papers relating to the townhouse. Olbur testified credibly that the townhouse had been sold before he bought his Buffalo Grove home in 1982 (Tr. at 80; P. Exs. 5, 6), making the loss, again, much too old to support a section 727(a)(5) claim. And neither the stock certificates nor the coin collection were assets with respect to which there was any "loss" or "deficiency." Olbur testified that the chapter 7 trustee had inventoried the coin collection and returned it to him [4] (Tr. at

---

4. It might also be questioned whether the coin collection was "substantial" enough to satisfy section 727(a)(5). *See Hermanson*, 273 B.R. at 545 (stating that section 727(a)(5)

80), and Cohen and Bernau themselves had seen the stock certificates because they introduced copies as exhibits at trial. (*See* P. Exs. 8, 9). The whereabouts of these assets were no mystery.

■ With respect to Olbur's beneficial interest in the land trust holding the Buffalo Grove property, finally, Cohen and Bernau at least established the loss of an asset: there was no dispute that Olbur no longer owned the beneficial interest. Olbur, however, gave a satisfactory explanation for its loss. He had attempted to dispose of his beneficial interest in the land trust in February 2003 by assigning the interest to his wife and son. (Tr. at 46). The attempt failed, he said, and the house was sold at foreclosure in February 2004. (*Id.* at 52). These events were documented, at least in part, with exhibits that Cohen and Bernau themselves introduced into evidence. (*See* P. Exs. 13, 16). What happened to the beneficial interest in the land trust was no mystery, either.

Because the evidence did not show that Olbur failed to explain satisfactorily any loss or deficiency of assets, judgment will be entered in Olbur's favor on the section 727(a)(5) claim.

### b. Section 727(a)(2)(A)

Cohen and Bernau are more successful on their claim that Olbur should be denied a discharge under section 727(a)(2)(A).

■ Section 727(a)(2)(A) denies a discharge to a debtor who, "with intent to hinder, delay, or defraud a creditor ...., has transferred, removed, destroyed, mutilated, or concealed ... property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). This exception to discharge has two elements: "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay or defraud a creditor)." [5] *In re Kontrick,* 295 F.3d 724, 736 (7th Cir.2002) (internal quotation omitted), *aff'd on other grounds sub nom. Kontrick v. Ryan,* 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004); *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein),* 299 B.R. 211, 226–27 (Bankr.N.D.Ill.2003). Both elements must have been present during the year before bankruptcy; anything earlier is "forgiven." *Kontrick,* 295 F.3d at 736; *Holstein,* 299 B.R. at 227.

[14] Cohen and Bernau proved the first element. Olbur's beneficial interest in the land trust was "property" for purposes of section 727(a)(2)(A). [6] *See Stowell,*

applies to loss of "substantial, identifiable assets"). Olbur testified that the coin collection was "small." (Tr. at 80). Cohen and Bernau offered no evidence to the contrary. *Cf. Farmers Nat'l Bank v. Kolbfleisch (In re Kolbfleisch),* 97 B.R. 351, 356 (Bankr.N.D.Ohio 1989) (refusing to deny discharge under section 727(a)(5) where debtor could not explain loss of car that had no "appreciable value").

5. The cases sometimes break section 727(a)(2)(A) down into four elements. *See, e.g., Lee Supply Corp. v. Agnew (In re Agnew),* 818 F.2d 1284, 1287 (7th Cir.1987). There is no substantive difference between the two formulations. *See Rhode Island Depositors Econ. Prot. Corp. v. Hayes (In re Hayes),* 229 B.R. 253, 259 n. 8 (1st Cir. BAP 1999) (em-

ploying the four-element version but noting that the "two-point articulation" is "substantively identical").

6. This is true whether the beneficial interest is considered personal property, *see Carlson v. United States (In re Carlson),* 126 F.3d 915, 924 (7th Cir.1997) (noting that under Illinois law, beneficial interest "is an interest in personal property"), or real property, *see In re Stowell,* 232 B.R. 823, 826 (Bankr.N.D.N.Y. 1998) (holding that under bankruptcy law, which looks to substance rather than form, the beneficiary is the owner of the real estate); *In re Ainslie & Belle Plaine Ltd. P'ship,* 145 B.R. 950, 955 (Bankr.N.D.Ill.1992) (same).

232 B.R. at 825 (finding debtor's beneficial interest to be property of the estate under section 541(a)); *Albion Prod. Credit Ass'n v. Langley (In re Langley),* 30 B.R. 595, 598–99 (Bankr.N.D.Ind.1983). Olbur transferred that property to his wife and son. The Code defines transfer "broadly," *McWilliams,* 284 F.3d at 793, to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). Under this definition, one Congress intended to be "as broad as possible," S.Rep. No. 95–989, at 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813, Olbur's disposition of his beneficial interest through an assignment to his wife and son was a "transfer."

Olbur, though, resists this conclusion. He contends that the assignment was ineffective because the trustee, LaSalle Bank, received the assignment but did not accept it. (Tr. at 46, 87, 103–04). Therefore, he claims, there was no "transfer" for purposes of section 727(a)(2)(A).

Olbur is mistaken. It is true that when a trust agreement deems an assignment ineffective unless lodged with and accepted by the trustee, the trustee's failure to accept the assignment is ineffective to transfer the property. *Ainslie,* 145 B.R. at 956. There is no transfer under those circumstances because the assignor retains the right to direct the trustee and to control and manage the property, attributes that indicate ownership. *Id.* at 955–56 (citing

*People v. Chicago Title & Trust Co.,* 75 Ill.2d 479, 481, 27 Ill.Dec. 476, 389 N.E.2d 540, 545 (1979)). The transfer may be effective in other limited respects, *see id.; Federal Deposit Ins. Corp. v. Wooten,* 80 B.R. 917, 920 (N.D.Ill.1987), but it does not transfer ownership of the property.[7]

Here, however, the evidence failed to bear out Olbur's contention. Once Cohen and Bernau established there had been an assignment—and it was uncontested there had been one—it was up to Olbur to prove the assignment ineffective. He did not. Olbur offered no evidence that the trust agreement (which was not introduced into evidence or even offered as an exhibit) required lodging and acceptance for the assignment to be effective. And apart from vague and uncorroborated assertions about a conversation between his bankruptcy lawyer and the trustee (*see* Tr. at 102–06), Olbur offered no evidence that the trustee had declined to accept the assignment. Given the state of the evidence, the court has little trouble finding that the assignment was effective and that there was indeed a "transfer" under section 727(a)(2)(A).

Cohen and Bernau also proved the second element of the claim: Olbur's intent in making the transfer to hinder, delay or defraud creditors. Section 727(a)(2) requires proof of actual intent. *McWilliams,* 284 F.3d at 790. Because direct evidence of intent rarely exists, however, intent may be inferred from the surrounding circumstances. *In re Snyder,*

---

7. *Ainslie* appears to be the only decision that has considered the effectiveness of an "absolute" assignment. As the court in *Ainslie* correctly noted, *see Ainslie,* 145 B.R. at 955, most of the case law in this arcane area has addressed an entirely different issue: whether an assignment is sufficient for perfection when there has been a *collateral* assignment of the beneficial interest for the purpose of conferring a security interest. Ending a long-standing debate among the federal courts in this district, *Klingman* held that if the trust agreement requires lodging and acceptance, the security interest is not perfected unless the assignment is lodged and accepted. *See Klingman v. Levinson,* 114 F.3d 620, 628 (7th Cir.1997); *see also Wagemann Oil Co. v. Marathon Oil Co.,* 306 Ill.App.3d 562, 570, 239 Ill.Dec. 549, 714 N.E.2d 107, 113 (1st Dist. 1999).

152 F.3d 596, 601 (7th Cir.1998). Certain factors, or "badges" of fraud, in particular may warrant the inference. *Holstein,* 299 B.R. at 229. These include a lack of consideration for the transfer; a familial or close relationship between the parties; the debtor's retention of possession, benefit or use of the property; the debtor's dire financial straits at the time; and the chronology of the events in question. *McWilliams,* 284 F.3d at 791; *Henbest v. Meyer (In re Meyer),* 307 B.R. 87, 91–92 (Bankr. N.D.Ill.2004); *Holstein,* 299 B.R. at 229–30.

This case bears each of these "badges." At the time of the assignment, Olbur had been unemployed for some time and was defending the Cohen and Bernau action in the circuit court. (Tr. at 7). He made the assignment just two weeks after the pretrial conference in that action, a conference where he was warned he had "substantial exposure" if the action went to trial, and only five days before the original February 18 trial date. (*Id.* at 67–68). Olbur assigned his beneficial interest to his wife and son, receiving no consideration in return. (*Id.* at 46, 49). As far as the record shows, he also continued to occupy the property after the assignment. Six weeks later, Olbur filed bankruptcy. (P.Ex. 3). Transferring property to a relative for no consideration on the eve of bankruptcy is a textbook example of fraud.[8] *Rogers v. Boba (In re Boba),* 280 B.R. 430, 435 (Bankr.N.D.Ill.2002).

Olbur naturally disputes the suggestion that he intended to defraud anyone. He insists the assignment's sole purpose was to "get [his name] off" the property so his mortgage could be refinanced. (Tr. at 86).

Although this might be a conceivable reason for some people to execute an assignment of this kind, it is not plausible here. Olbur executed the assignment with Cohen and Bernau's action against him looming, an adverse judgment in that action imminent, and bankruptcy only weeks away. For Olbur to assert that refinancing was uppermost in his mind, and that he was not bent on putting his property beyond the reach of creditors, is more than the court can accept. This is especially so since the assertion came only from Olbur. No lawyer, no banker, no family member, no witness of any kind was called to support his story. Not even his wife and son came forward. In this case, as in most, the circumstances under which the transfer took place are far more telling than the debtor's own "self-serving statement of his intent." *Costello,* 299 B.R. at 895 (internal quotation omitted).

Because Olbur transferred property within a year of his bankruptcy intending to hinder, delay or defraud his creditors, judgment will be entered in favor of Cohen and Bernau and against Olbur on the section 727(a)(2)(A) claim.

#### c. Section 727(a)(4)(A)

Cohen and Bernau are also entitled to judgment on their claim that Olbur should be denied a discharge under section 727(a)(4)(A).

 To receive the "fresh start" the Bankruptcy Code offers, a debtor must present accurate and truthful information about himself and his affairs. *Bostrom,* 286 B.R. at 359. All assets and ownership interests must be disclosed, and all questions in the schedules and statement of financial affairs must be answered completely and honestly. The trustee and

---

**8.** Olbur did list the Buffalo Grove property on his bankruptcy schedules. (*See* P.Ex. 1). He testified, however, that his bankruptcy lawyer had told him the assignment of his beneficial interest in the land trust holding the property "was no good." (Tr. at 102, 106). It is fair to conclude that the property appeared on the schedules only because of that advice.

creditors have a right to receive information that will allow them to evaluate the case and administer the estate's property. *Jordan v. Bren (In re Bren)*, 303 B.R. 610, 614 (8th Cir. BAP 2004). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Id.* (internal quotation omitted). Complete financial disclosure is therefore "a condition precedent to the privilege of discharge." *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 359 (Bankr.N.D.Ill.2001).

 Section 727(a)(4)(A) enforces the debtor's duty of disclosure by denying a discharge to a debtor who has "knowingly and fraudulently, in or in connection with the case ... made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To prevail under section 727(a)(4)(A), an objecting party must establish that (1) the debtor made a statement under oath; (2) the statement was material to the bankruptcy case; (3) the statement was false; (4) the debtor knew the statement was false; and (5) the statement was made with an intent to deceive. *Costello*, 299 B.R. at 899; *Bostrom*, 286 B.R. at 359; *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr. N.D.Ill.2000); *Bailey*, 145 B.R. at 928.

 Cohen and Bernau proved each element by a preponderance of the evidence. First, Olbur made statements under oath because all debtors swear to the accuracy of their petitions and schedules. *Costello*, 299 B.R. at 899; *Bostrom*, 286 B.R. at 360. Second, all of the statements Olbur made in his petition and schedules relating to his business transactions, to his assets and their discovery, and to "the existence and disposition of his property" were material to the bankruptcy. *Netherton v. Baker (In re Baker)*, 205 B.R. 125,

133 (Bankr.N.D.Ill.1997) (internal quotation omitted); *see also Costello*, 299 B.R. at 900.

Third, several of the statements were false. Olbur failed to list the stock certificates from the safe deposit box and in fact checked "none" next to "stock." (P.Ex. 4 at 4). He failed to list the box itself and checked "none" next to "safe deposit boxes." (*Id.* at 19). He listed no income for himself or his wife, although both he and his wife had income. (P.Ex. 4 at 13; Tr. at 32–33). He listed no expenses whatever, although he had all the usual household expenses. (P.Ex. 4 at 14; Tr. at 33–39). He listed two of his businesses as either still operating or having recently ceased operations, when they had gone out of business years earlier. (P.Ex. 4 at 21). And although the judgment in favor of Cohen and Bernau had just been entered against him, Olbur failed to list it as a debt or Cohen and Bernau as creditors. (P. Exs. 3, 4).

Considered separately, these may not have been particularly serious misstatements. Probably none would warrant a denial of discharge on its own. *See Bren*, 303 B.R. at 614 (observing that courts often forgive "a single omission or error resulting from innocent mistake"); *Bostrom*, 286 B.R. at 360 (noting that not every item of property must be scheduled and valued or each liability described with "arithmetic precision"); *but see Dean v. McDow*, 299 B.R. 133, 140 (E.D.Va.2003) (stating that "there is no de minimis exception" to the disclosure requirements). Viewed together as they must be, however, *see Bailey*, 145 B.R. at 929 (considering falsehoods "collectively" and judging their "cumulative effect"), the errors and omissions in Olbur's petition and schedules paint an unattractive picture, one of actual

dishonesty. "[T]here comes a point when the aggregate errors and omissions cross the line." *Bostrom,* 286 B.R. at 360. That line was crossed here.

▮ Fourth, the evidence of Olbur's actual mental state confirmed what his petition and schedules suggest: that Olbur knew his statements were false, and that he made them with a fraudulent intent. For a debtor to possess the intent that will bar his discharge, he must either have knowingly intended to defraud or he must have "engaged in such reckless behavior as to justify the finding of fraud." *In re Yonikus,* 974 F.2d 901, 905 (7th Cir.1992). Sometimes described more vividly as "reckless indifference," *see, e.g., Senese,* 245 B.R. at 575, reckless disregard consists of simply "not caring whether some representation is true or false," *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998); *see also Yonikus,* 974 F.2d at 905 (holding that fraudulent intent will be inferred when "the debtor acted so recklessly ... that fraud is implied").

Olbur's is an unusually glaring case of "reckless disregard." Although Olbur certified under oath that he had read his petition and schedules before signing them, he admitted at trial he had not. (Tr. at 23–24, 92–93). In fact, he said, the thought of doing so never crossed his mind, certification notwithstanding. (*Id.* at 93). Olbur not only failed to read the petition and schedules before he signed them, he did not bother to read them even after Cohen and Bernau objected to his discharge, took his deposition in the adversary proceeding, and then brought him to trial. (*Id.* at 23–25). Once his lawyer prepared the petition and schedules, Olbur simply signed them and never looked back. He could not have been less interested in whether they were accurate.

▮ Passively signing an error-filled bankruptcy petition and schedules without reading them first can constitute reckless indifference to the truth and therefore fraud. *Bren,* 303 B.R. at 614–15 (citing cases); *see also Bostrom,* 286 B.R. at 361. Olbur's lack of concern about his petition and schedules fully justifies an inference of fraudulent intent. Olbur is an intelligent, well-educated businessman, someone acquainted with financial matters and undaunted by arid paperwork. He knew better. *See, e.g., Bostrom,* 286 B.R. at 362; *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig),* 237 B.R. 453, 457 (Bankr. N.D.Ill.1999) (finding fraudulent intent where debtor was "intelligent and experienced businessman knowledgeable in his industry"). That Olbur did nothing to correct the errors after this proceeding brought them to light merely demonstrates that to Olbur, full and honest disclosure was unimportant. *Cf. Bensenville Cmty. Ctr. Union v. Bailey (In re Bailey),* 147 B.R. 157, 165 (Bankr.N.D.Ill.1992) (observing that later amendments to erroneous schedules may show innocent intent).

For his part, Olbur lays the blame for the mistakes in his petition and schedules on his bankruptcy lawyer. He maintains that he gave his lawyer all the necessary information and so believed everything was in order. (Tr. at 15). Olbur also attributes the problems to the hurried nature of his filing, coming as it did on the heels of the judgment and Cohen and Bernau's aggressive collection efforts. (*Id.* at 15, 114, 117).

▮ Olbur will find no solace in these arguments. When a debtor has declared under penalty of perjury that he has read his petition and schedules and that they are true and correct, the debtor—not his lawyer—is accountable for any errors and omissions. *See Bostrom,* 286 B.R. at 363;

*Rosenzweig,* 237 B.R. at 457–58; *Baker,* 205 B.R. at 132; *see also Ardisson,* 272 B.R. at 359. As for the haste with which Olbur had to file, that hardly makes him exceptional. Most debtors who seek bankruptcy protection have creditors pounding on the door and must act quickly. They are obligated to provide a complete and accurate account of their property and financial affairs for all that.[9]

Because Olbur knowingly and fraudulently made a false oath in connection with the case, judgment will be entered in favor of Cohen and Bernau and against Olbur on the section 727(a)(4)(A) claim.

### 4. Conclusion

Judgment is entered in favor of defendant Allan M. Olbur and against plaintiffs Sheila Cohen and Rhona Bernau on Count III of the complaint. Judgment is entered in favor of plaintiffs Sheila Cohen and Rhona Bernau and against defendant Allan M. Olbur on Counts I and II of the complaint. Debtor Allan M. Olbur is denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A). A Rule 9021 judgment will be entered consistent with this opinion.

---

9. Had the last-second nature of the filing genuinely been the cause of the errors here, Olbur would presumably have shown some interest in fixing them, once the automatic stay gave him some breathing room, by filing amended schedules. He never showed any such interest.